No. 14-16840

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

KAMALA D. HARRIS,
in her official capacity as the Attorney General of California,
*Defendant-Appellant*,

v.

JEFF SILVESTER, et. al.,
*Plaintiffs-Appellees*.

_____

Appeal from the United States District Court for the
Eastern District of California, No. 1:11-cv-02137-AWI-SKO
(Hon. Anthony W. Ishii, Judge)

_____

**APPELLEES' ANSWERING BRIEF**
_____

| | | |
|---|---|---|
| BRADLEY A. BENBROOK | DONALD E.J. KILMER, JR. | VICTOR J. OTTEN |
| STEPHEN M. DUVERNAY | LAW OFFICES OF DONALD | OTTEN LAW, PC |
| BENBROOK LAW GROUP, PC | KILMER | 3620 Pacific Coast |
| 400 Capitol Mall, Ste. 1610 | 1645 Willow St., Ste. 150 | Hwy, Ste. 100 |
| Sacramento, CA 95814 | San Jose, CA 95125 | Torrance, CA 90505 |
| Tel: (916) 447-4900 | Tel: (408) 264-8489 | Tel: (310) 378-8533 |
| Fax: (916) 447-4904 | Fax: (408) 264-8487 | Fax: (310) 347-4225 |
| brad@benbrooklawgroup.com | Don@DKLawOffice.com | vic@ottenlawpc.com |

*Counsel for Plaintiffs-Appellees*

May 26, 2015

## CORPORATE DISCLOSURE STATEMENT

Calguns Foundation, Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

The Second Amendment Foundation, Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... v

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE CASE ................................................................... 3

   I.   Factual And Statutory Background ...................................................... 3

      A.   California's Waiting Period Laws Have Ranged From One Day To
           15 Days And Back Down To 10 Days ........................................... 3

      B.   The California Legislature And Congress Have Mandated The
           Creation Of Multiple Databases That DOJ Uses To Check And
           Cross-Check A Purchasers' Eligibility To Own A Firearm .......... 6

         1.   The California Background Check ............................................. 7

         2.   The Armed And Prohibited Persons System And Rap-Back
             Program Notify The State When A Known Firearm Owner
             Becomes Prohibited. ................................................................ 11

      C.   The As-Applied Classes Consist Of Citizens Known To The State
           To Lawfully Own Firearms. ....................................................... 12

         1.   Gun Owners Identified In Automated Firearms System. .......... 12

         2.   CCW Permit Holders ............................................................... 13

         3.   Certificate Of Eligibility And A Firearm In The AFS .............. 14

   II.   Procedural History ......................................................................... 15

SUMMARY OF ARGUMENT .................................................................. 17

STANDARD OF REVIEW ....................................................................... 20

ARGUMENT ............................................................................................ 22

   I. The District Court Properly Rejected DOJ's Various Arguments That
      This Is Not A Second Amendment Case ............................................ 22

A.    The Record Offers No Support For DOJ's Claim That The WPLs Fall Outside The Scope Of The Second Amendment As Historically Understood .............................................................. 23

    1.   DOJ Cites No Government Restrictions Remotely Similar To A Waiting Period At The Relevant Times ........................................ 25

    2.   DOJ Cannot Rely On Non-Governmental Impediments To Purchasing Guns To Show The Understanding Of A Constitutional Limitation On Government Action ............................................... 28

B.    The WPL Does Not Fall Within The Categories Of "Presumptively Lawful" Regulations Mentioned in *Heller*'s Footnote 26 ............ 29

    1.   This Case Does Not Implicate *Heller*'s Reference To "Conditions And Qualifications On The Commercial Sale Of Arms." ................................................................................... 30

    2.   The WPLs Are Not Prohibitions On Possession By Felons Or The Mentally Ill ......................................................................... 31

C.    There Is No Separate Second Amendment Safe Harbor For "Longstanding" Regulations ........................................................ 31

II.   The District Court Correctly Found That Applying The Waiting Period Laws To The As-Applied Classes, After A Background Check Is Passed, Does Not Survive Intermediate Scrutiny .......................... 36

A.    The District Court Relied On The Applicable "Reasonable Fit" Standards Imported From First Amendment Doctrine, Which The Opening Brief Largely Ignores ..................................................... 37

B.    The District Court Properly Concluded That The Background Check Rationale Did Not Justify Waiting Ten Days For Checks That Are Completed In Less Time ............................................... 43

C.    The District Court Properly Concluded That Applying The Ten-Day Waiting Period To Purchasers Who Already Own A Firearm Is Not A Reasonable Fit Under The Cooling Off Rationale ......... 49

    1.   The State Clings To Its Argument That Subsequent Purchasers May No Longer Have Their First Gun And Ignores The District Court's Solution To This Supposed Dilemma ............................. 52

iii

2. The Court's Observations About The Goals Of Various Firearms Laws Were Not Erroneous Factual Findings About Gun Owner's "Personality Traits." ....................................................................... 55

D. The State Does Not Appear To Contest The District Court's Finding That The "Straw Purchase Investigation" Interest Does Not Establish A Reasonable Fit .................................................... 58

III. The Court Did Not Abuse Its Discretion In Fashioning The Injunction ..................................................................................... 59

CONCLUSION ............................................................................................ 61

STATEMENT OF RELATED CASES ....................................................... 62

CERTIFICATE OF COMPLIANCE .......................................................... 63

CERTIFICATE OF SERVICE .................................................................... 64

iv

# TABLE OF AUTHORITIES

## Cases

*ACORN v. Bysiewicz*,
    413 F.Supp.2d 119 (D. Conn. 2005) .................................................... 43

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985) ..................................................................... 20, 21

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989) ............................................................................ 37

*Brown v. Entm't Merchants Ass'n*,
    131 S. Ct. 2729 (2011) ....................................................................... 24

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) ....................................................................... 48

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ............................................................................ 42

*Central Hardware Co. v. NLRB*,
    407 U.S. 539 (1972) ............................................................................ 29

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002) ............................................................................ 40

*City of Renton v. Playtime Theaters, Inc.*,
    475 U.S. 41 (1986) ....................................................................... 39, 40

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................... passim

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ............................................................................ 21

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ............................................................... 39, 40, 55

*Ezell v City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .............................................................. 24

*Fantasyland Video, Inc. v. Cnty. of San Diego*,
    505 F.3d 996 (9th Cir. 2007)................................................................. 38

*Florida Retail Fed'n, Inc. v. Atty. Gen. of Fla.*,
    576 F.Supp.2d 1281 (N.D. Fla. 2008).................................................. 29

*Fyock v. City of Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015)................................................... 19, 35, 39

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014)........................................................ passim

*Kachalsky v. Cnty of Westchester*,
    701 F.3d 81 (2d Cir. 2012).................................................................. 26

*King Mountain Tobacco Co., Inc. v. McKenna*,
    768 F.3d 989 (9th Cir. 2014)............................................................... 20

*LeMaire v. Maass*,
    12 F.3d 1444 (9th Cir. 1993)............................................................... 21

*Marbury v. Madison*,
    1 Cranch 137 (1803) ........................................................................... 25

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)..................................................................... 22, 32

*Mississippi Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ........................................................................... 40

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012)............................................................... 28

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) ........................................................................... 48

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and
    Explosives*,
    700 F.3d 185 (5th Cir. 2012)............................................................... 35

*Nordyke v. King*,
    681 F.3d 1041 (9th Cir. 2012) ............................................................ 30

*People v. Bickston*,
    91 Cal.App.3d Supp. 29 (Cal. App. Dep't Super. Ct. 1979) .................. 4

*People v. Hunter*,
    202 Cal.App.4th 261 (2011) ................................................ 12

*People v. James*,
    174 Cal.App.4th 662 (2009) ............................................... 12

*Peruta v. Cnty. of San Diego*,
    742 F.3d 1144 (9th Cir. 2013) ....................................... 28, 57

*Pullman-Standard v. Swint*,
    456 U.S. 273 (1982) ....................................................... 20

*Reed v Town of Gilbert*,
    707 F.3d 1057 (9th Cir. 2013) ............................................ 38

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992) ....................................................... 60

*Ruiz v. Affinity Logistics Corp.*,
    754 F.3d 1093 (9th Cir. 2014) ............................................ 20

*Silvester v. Harris*,
    41 F.Supp.3d 927 (E.D. Cal. 2014) ........................................ 16

*SmithKline Beecham Corp. v. Abbott Labs.*,
    740 F.3d 471 (9th Cir. 2014) ............................................. 41

*Stone v. City & Cnty. of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) ............................................. 60

*Storer v. Brown*,
    415 U.S. 724 (1974) ....................................................... 43

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ................................................. 20, 21

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) ....................................................... 41

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
    429 F.3d 869 (9th Cir. 2005)................................................................ 21

*United States v. AMC Entm't, Inc.*,
    549 F.3d 760 (9th Cir. 2008)................................................................ 21

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012)................................................................ 39

*United States v. Chovan*,
    735 F.3d 1127 (9th Cir. 2013) ...................................................... passim

*United States v. Marzzarella*,
    614 F.3d 85 (3rd Cir. 2010) ......................................................... 30, 38

*United States v. Rene E.*,
    583 F.3d 8 (1st Cir. 2009) .................................................................... 34

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010)......................................................... 33, 34

*United States v. Stevens*,
    559 U.S. 460 (2010) .............................................................................. 25

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ............................................................ 20

*Valley Broad. Co. v. United States*,
    107 F.3d 1328 (9th Cir. 1997) ................................................ 39, 55, 56

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .............................................................................. 37

*Zablocki v. Redhail*,
    434 U.S. 374 (1978) .............................................................................. 42

*Zivkovic v. S. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) ............................................................ 20

viii

**Statutes**

11 Cal. Code Regs. § 4031 ........................................................... 14

11 Cal. Code Regs. § 4037 ........................................................... 14

1923 Cal. Stat. ch. 339 .............................................................. 3, 4

28 U.S.C. § 158 ......................................................................... 31

Brady Handgun Violence Prevention Act, 18 U.S.C. § 922 ........................ 6

Cal. Fam. Code § 2320 ............................................................... 31

Cal. Penal Code § 12083 .............................................................. 5

Cal. Penal Code § 26150 ................................................. 13, 57, 58

Cal. Penal Code § 26155 ................................................. 13, 57, 58

Cal. Penal Code § 26165 ...................................................... 14, 57

Cal. Penal Code § 26190 .............................................................. 14

Cal. Penal Code § 26220 .............................................................. 14

Cal. Penal Code § 26710 .............................................................. 14

Cal. Penal Code § 26815 .............................................................. 15

Cal. Penal Code § 27535 ............................................................... 8

Cal. Penal Code § 27540 .............................................................. 15

Cal. Penal Code § 28220 .......................................................... 7, 10

Cal. Penal Code § 28250 .............................................................. 54

Cal. Penal Code § 29800 ............................................................... 6

Cal. Penal Code § 29805 ............................................................... 6

Cal. Penal Code § 29905 ............................................................... 6

Cal. Penal Code §§ 30000 ........................................................... 48

Cal. Penal Code §§ 30000-30015 ............................................................... 11

Cal. Penal Code §§ 31610-31670 .............................................................. 13

Cal. Stats. 1990, ch. 9 (A.B. 497), § 12 ........................................... 5

Cal. Welf. & Inst. Code §§ 8100-8108 ........................................... 6

Fed. R. Civ. P. 52 ............................................................................. 20

**Other Authorities**

Cal. Dep't of Justice, Office of the Atty. Gen., *Senate Bill 140, Legislative Report Number One, Armed and Prohibited Persons System* (2014) ....... 47

Clayton E. Cramer, *The Racist Origins of California's Concealed Weapon Permit Law* (Apr. 27, 2014) ........................................................ 4

Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) .......................... 34

L.A. Times, *Editorial*, *State falls behind on efforts to keep guns out of the wrong hands*, May 12, 2015 .................................................... 47

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) .............. 34

Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* (W.W. Norton & Co. 2011) ........................................................ 27

## INTRODUCTION

This case was brought and tried on a simple premise: If (a) California's firearms databases confirm that a prospective firearms purchaser already owns a gun and (b) the purchaser passes a background check in which several law enforcement databases confirm the purchaser isn't barred from still possessing their gun, the purchaser's exercise of Second Amendment rights should not be delayed beyond the point at which they pass the background check. In the constitutional parlance of "intermediate scrutiny," the State's ten-day waiting period laws ("WPLs") are not a "reasonable fit" for achieving the State's purposes of conducting a background check (the check has already been performed) or imposing a "cooling off period" (the purchaser already owns a gun).

The District Court held a three-day trial, received testimony from eight witnesses, accepted reams of studies and legislative history into the record, and issued a 56-page ruling, all to reach the common-sense conclusion underlying the litigation. The State never comes to grips with the fact that its evidence, legislative history, and social science studies simply fell short in the face of reality. It wants a retrial on appeal.

On the legal question at the first step of the test governing Second Amendment claims in this Circuit, *United States v. Chovan*, 735 F.3d 1127,

1

1136 (9th Cir. 2013), the State repeats its argument that this is not a Second Amendment case at all because waiting-period laws fall outside the scope of the Second Amendment under *District of Columbia v. Heller*, 554 U.S. 570 (2008). This argument fails, however, principally because waiting period laws did not exist in any form until 1923.

At the second step, the State resorts mainly to denial and scare tactics. It denies that its interest in conducting background checks is actually vindicated because evidence of a disqualification "may" arrive some time between when the background check is completed and the end of the ten-day waiting period. The District Court rejected this argument based on the evidence, and that finding was not clearly erroneous.

The State also denies reality in arguing that its cooling-off justification requires a ten-day wait because subsequent purchasers "may" have lost their gun and, in any event, the State's databases and background check can't be trusted to work. The District Court rejected this argument, and its multiple findings were not clearly erroneous. The court even proposed a solution to this professed concern, which the State ignores. Finally, the State's argument that subsequent purchasers need to be "cooled off" even if they still possess other firearms is actually contradicted by the testimony and one of the State's own social science articles, and it finds no support in the legislative history.

2

First Amendment cases establish that intermediate scrutiny's "reasonable fit" test is not a rubber stamp for any theory the State may posit to justify a law that burdens constitutional rights. The same is true for the Second Amendment. The judgment should be affirmed.

## STATEMENT OF THE CASE

### I.    Factual And Statutory Background

#### A.    California's Waiting Period Laws Have Ranged From One Day To 15 Days And Back Down To 10 Days.

The State has identified no laws or historical materials to show the existence of government-imposed waiting periods on the purchase of firearms at or near the time of the founding (1791) or the ratification of the Fourteenth Amendment (1868). ER 17:3-8. Since first enacting a WPL in 1923, California has altered the length of the waiting period as the scope and method of performing background checks has evolved.

**<u>1923-1955: At least one day.</u>** California enacted its first WPL in 1923. It barred delivery of a pistol, revolver, or concealable firearm on the day of purchase. ER 18:1-3 (citing 1923 Cal. Stat. ch. 339 §§ 10-11, ER 223). This law also created the "Dealer Record of Sale" (DROS) system, which required dealers to obtain identifying information about purchasers and mail the form to the local police or county clerk on the day of the sale. SER 36-38, 1923

3

Cal. Stat. ch. 339 § 9. The record contains no information regarding whether investigations into purchaser eligibility actually took place based on this information. The only classes of people disqualified for purchase under the law were felons and unnaturalized immigrants. SER 35, 1923 Cal. Stat. ch. 339 § 2. DOJ cites speculation that the point of this law was to provide "at least an overnight cooling off period,"[1] but there is no evidence in the record that this initial one-day waiting period was motivated by a cooling off rationale.[2]

**1955-1965: Three days.** In 1955, the handgun waiting period was extended to three days. ER 18:13-14. The record does not reflect the reason for this change.

**1965-1975: Five days.** In 1965, the Legislature extended the handgun waiting period from three days to five days in order to allow sufficient time for the DOJ and law enforcement to complete a manual background check.

---

[1] The Opening Brief cites *People v. Bickston*, 91 Cal.App.3d Supp. 29, 32 (Cal. App. Dep't Super. Ct. 1979), for the proposition that the 1923 law was enacted to provide for a cooling off period, but the passage in *Bickston* actually refers to the 1953 enactment of the same language in a different code section. *See* ER 18:5-9.

[2] Indeed, it appears that the main point of California's original gun control law was preventing guns from getting into the hands of immigrants. *See* Clayton E. Cramer, *The Racist Origins of California's Concealed Weapon Permit Law* 14 (Apr. 27, 2014) (unpublished manuscript, online at http://bit.ly/1e3x7ye).

ER 18:15-26 (citing ER 250, SER 39, and ER 243).

**1975-1996: Fifteen days.** The waiting period was lengthened from 5 to 15 days in 1975. Again, the purpose of the extension was to accommodate the background check. ER 19:1-10. "A waiting period of 5 days was thought to be 'inadequate,'" ER 19:7 (quoting ER 245), and 15 days would "[g]ive law enforcement authorities sufficient time" to manually investigate criminal and mental health records. ER 19:4-5 (quoting ER 297); *see also* ER 244-45.

In 1991, the Legislature expanded the background check to apply to all firearms purchases. ER 19:11-12. That same bill directed the California Department of Justice ("DOJ") to undertake a feasibility study concerning technological alternatives to update the background check system (which at that point still relied on manual processing) to enable the State to "[r]educe the current 15-day waiting period to a lesser waiting period as the result of the introduction of automation, computerization, or other devices or means which have increased efficiency in screening the eligibility of persons to purchase and possess firearms." Cal. Stats. 1990, ch. 9 (A.B. 497), § 12 (codified at former Cal. Penal Code § 12083(a)(2)).

**1996-present: Ten days.** In 1996, the Legislature reduced the waiting period to 10 days along with an advance in technology: the DOJ "switched to an electronic database system, which allowed for faster processing of

background checks." ER 19:16-21. In the legislative history for the 1996 law, the "cooling off" rationale is mentioned for the first time. ER 19:23-26. As the District Court noted, however, that history contains no "specific findings or evidence related to the 'cooling off' period." ER 19:26-27.

**Federal Law: Wait eliminated after automation**. For a brief period in the 1990s, the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922(s), imposed a five-day waiting period on handgun purchases. This interim measure expired in 1998 with the launch of the National Instant Criminal Background Check System (NICS), at which point dealers could release firearms once automated background check was complete. *See* 18 U.S.C. § 922(t).

**B. The California Legislature And Congress Have Mandated The Creation Of Multiple Databases That DOJ Uses To Check And Cross-Check A Purchasers' Eligibility To Own A Firearm.**

California law prohibits several classes of people from owning a firearm. Examples of such "prohibited persons" include individuals convicted of felonies, a misdemeanor crime of domestic violence, or other violent crime. Cal. Penal Code §§ 29800, 29805, 29905. State law likewise restricts the mentally ill from possessing firearms. Cal. Welf. & Inst. Code §§ 8100-8108. Any citizen who wants to purchase a firearm and does not fall into one of the

6

law's 18 exemptions[3] must pass the background check to show that they do not fall into one of the prohibited classes.

Since 1995, California law has required that the background check consist of automated analyses of multiple law enforcement databases that are continually updated. *See* Cal. Penal Code § 28220(a) (directing DOJ to "examine its records" "to determine" whether purchaser is prohibited). Since the Opening Brief minimizes and at times even denigrates the value of the DOJ-administered systems used in the background check process, we summarize them below to provide a fuller background. The District Court's ruling describes the process in detail, ER 20-31, 34-35, and the multi-step, acronym-heavy process is depicted in graphical form at Trial Exhibit CB, ER 221. Because Plaintiffs have not challenged the background check requirement, *see* ER 8:18-22, all individuals must still undergo this background check before taking possession of a firearm.

### 1. The California Background Check

The starting point of California's Bureau of Firearms (the "Bureau") background check is the DROS entry system. The DROS is the computerized, point-of-sale application system firearms dealers use to submit applications to

---

[3]    The 18 categories of exemptions are set forth in Plaintiffs' First Amended Complaint. (ER 322:9-324:7.)

purchase firearms to the Bureau. The DROS application is processed through DOJ's Consolidated Firearms Information System ("CFIS"), an automated system that "coordinates the electronic portion of the background check process, called the Basic Firearms Eligibility Check ("BFEC"), by sending inquiries to other electronic databases and compiling the responses." ER 20:11-15.

- First, BFEC queries the State's Department of Motor Vehicles database, to ensure the purchaser's identifying information is valid. ER 20:16-21:17.

- Next, the BFEC checks the Automated Firearms System ("AFS") database to determine whether the firearm has been reported lost or stolen. ER 21:18-21. AFS is a database that tracks firearms transactions and ownership based on variety of sources. The bulk of the records are from transactions processed through the DROS system since 1996. ER 21:23-27; *see also* ER 21:27-28:5 (noting additional sources of AFS data).

- If the firearm passes the AFS check, the eligibility check begins. CFIS checks its own records to ensure the purchaser has not purchased another handgun in the previous 30 days. (Californians may only purchase one handgun in a 30-day period. Cal. Penal Code § 27535.) ER 22:19-23:3.

- Next, the BFEC checks a series of state and federal criminal and mental-health databases to confirm that the purchaser is not prohibited from purchasing firearms under state or federal law.

  ➢ On the State side, the purchaser's information is run through California's Automated Criminal History System ("ACHS"), a "database that contains criminal history information reported to Cal. DOJ by criminal justice agencies in California." ER 23:5-7. In addition to its own records, ACHS checks three other state databases that may bear on the purchaser's eligibility: (1) the "Wanted Persons System" database, which contains current warrant information; (2) the "California Restraining and Protective Order System" database, which covers domestic violence restraining orders and other protective orders; and (3) the "Mental Health Firearms Prohibition System" database, which includes records of people prohibited from purchasing due to mental health issues. ER 23:8-26.

  ➢ The purchaser's information is then checked against the federal NICS database. ER 24:12-14. Similar to the state system, NICS checks its own database and three additional federal databases: (1) the "Interstate Identification Index," which "contains criminal history records from California and other states that share their criminal history records with the FBI," ER 24:21-22; (2) the "National Crime Information Center," which

9

"contains federal warrants, domestic violence restraining orders, and stolen gun information," ER 24:25-26; and (3) and the "Immigration and Customs Enforcement" database, which "helps to identify people who are in the United States unlawfully." ER 24:27-28.

If the application passes through each of these steps without a "hit" showing that the purchaser is prohibited, the application is "auto-approved," and the background check is complete based on the electronic process alone. ER 27:20-23. Steven Buford, Assistant Chief of the Bureau, testified that approximately 20% of all applications are auto-approved. ER 30:1-2 (citing SER 2:13-15). Auto-approvals can occur as quickly as one minute, but "probably" in less than an hour. ER 30:3-5.

On the other hand, if an application generates any "hits" or "matches" in the background check process, it is sorted for manual review by a DOJ analyst. ER 25:7-11; *see also* ER 25:12-27:18 (detailing review process). The DOJ has authority to delay the delivery of a firearm for up to 30 days in order to complete the background check. *See* Cal. Penal Code § 28220(f); ER 28:1-4 & n.25.

Upwards of 99% of all DROS applications are approved by DOJ. ER 28:16-29:6. For example, in 2013, DOJ processed 960,179 DROS applications, with only 7,371 denials. ER 29:2-3.

10

### 2. The Armed And Prohibited Persons System And Rap-Back Program Notify The State When A Known Firearm Owner Becomes Prohibited.

Two additional safeguards work hand-in-hand with the databases discussed above to prevent prohibited persons from possessing firearms. The first is the Armed and Prohibited Persons System ("APPS"), "a database that cross-references persons with firearms records in the AFS, typically a DROS record, with those who have a prohibiting conviction or circumstance." ER 34:19-21. *See also* Cal. Penal Code §§ 30000-30015. "The purpose behind APPS is to identify prohibited persons who have firearms and to enable law enforcement to retrieve the firearms before those persons can use the firearms to harm others or themselves." ER 34:26-28. The APPS database consults each of the California databases described above, and is updated 24 hours a day, 7 days a week. ER 34:21-25.

The second safeguard is the "rap back" service, which "is a notification that Cal. DOJ receives whenever someone with fingerprints on file with Cal. DOJ is the subject of a criminal justice agency record, *e.g.* a notification of a subsequent arrest record." ER 35:18-20. The rap-back system is fingerprint-based, *i.e.*, it only applies to an event (such as an arrest) where fingerprints are taken. ER 35:20-23.

11

### C. The As-Applied Classes Consist Of Citizens Known To The State To Lawfully Own Firearms.

The organizational plaintiffs sued on behalf of three as-applied classes of California gun owners, all of whom already have firearms registered in DOJ databases.

### 1. Gun Owners Identified In Automated Firearms System.

The first as-applied class consists of individuals with firearms listed in the State's Automated Firearms System. While AFS should contain the record of all dealer handgun sales since 1996, *supra*, the District Court noted that, "[t]he AFS database is not an 'absolute database,'" ER 22:5-6, as it "does not contain records for every gun in circulation in California." ER 21:22-23. Rather, it "is a type of 'leads database' that reflects Cal. DOJ's belief about whom the last possessor of a firearm was based on the most recent DROS transaction. Law enforcement personnel can access the AFS in the field in real time, and law enforcement officers view the AFS database as reliable." ER 22:6-9 (citations to transcript omitted).[4]

---

[4]    Reported cases confirm that law enforcement relies on AFS in investigating criminal activity, and to support the search and seizure of weapons. *E.g.*, *People v. James*, 174 Cal.App.4th 662, 665-66 (2009) (DOJ agent relied on AFS to investigate and seize weapons in response to restraining order issued against defendant); *People v. Hunter*, 202 Cal.App.4th 261, 266 (2011) (detective relied on AFS to investigate suspect

12

Separate from passing the background check process described above, all firearms purchasers must satisfy additional safety-related requirements. Purchasers must possess a current "Firearm Safety Certificate," which is issued by the DOJ based on a written test covering firearms safety and California firearms law. Cal. Penal Code §§ 31610-31670. Before a dealer may deliver a firearm, the purchaser must demonstrate safe handling of the firearm being purchased and buy a "firearm safety device" (such as a trigger lock or gun safe) to prevent use by children or unauthorized users. *Id.*, §§ 26850-26860 and 23635. The injunction impacts none of these requirements.

### 2. CCW Permit Holders

The second as-applied class consists of persons who possess a valid license to carry a concealed weapon ("CCW").

California law imposes a number of requirements on CCW holders over and above the requirements applicable to all purchasers. Before being issued a CCW, an individual must apply to their local sheriff or chief of police, and demonstrate "good moral character," establish "good cause," and complete a training course on firearm safety and firearms law. Cal. Penal Code §§ 26150, 26155. CCW applicants must submit their fingerprints to the DOJ, *id.*, §

---

held for armed robbery). *See also* SER 30-34 (detailing the "tactical," "investigative," and "prosecutorial" uses of AFS).

26185(a)(1), and may be subject to psychological testing. *Id.*, § 26190(f). DOJ processes the fingerprints and conducts a new background check to determine whether the applicant is prohibited from purchasing or possessing a firearm. *Id.*, § 26185. *See* ER 36-37. A CCW permit is valid for only two years. Cal. Penal Code § 26220(a). CCW holders are subject to the rap-back system. ER 37:26-27. The injunction impacts none of these precautionary measures.

### 3. Certificate Of Eligibility And A Firearm In The AFS

The third as-applied class is a subset of the first: it consists of persons identified in the AFS system who also possess a "certificate of eligibility" ("COE"). A COE, issued by the DOJ, confirms a person's eligibility to lawfully possess and/or purchase firearms under state and federal law. Cal. Penal Code § 26710; 11 Cal. Code Regs. § 4031(g). COE applicants must answer questions regarding their criminal record and mental illness history, and provide personal information (including fingerprints) to the DOJ, which then runs a background check to ensure that the applicant is not prohibited under state or federal law. 11 Cal. Code Regs. § 4037. A COE is valid for only one year at a time. ER 38:14-17. *See* ER 38:3-39:10. COE holders are subject to the rap-back system. ER 39:9.

As the District Court noted, "[a] COE is one component/requirement for several exceptions to the 10-day waiting period and for other firearms

14

related activities," including firearm consultant evaluators, "curio and relic" collectors, retail firearms dealers, gun show organizers, and firearms manufacturers. ER 38:18-39:4.[5]

## II.      Procedural History.

On December 23, 2011, Plaintiffs filed suit challenging the constitutionality of California's WPLs, Cal. Penal Code §§ 26815 and 27540, as applied to the three classes of individuals identified above. Plaintiffs alleged that enforcement of the WPLs against them infringed their Second Amendment right to keep and bear arms on the theory that, when the State knows an individual already owns a gun, the State does not have a sufficient rationale to subject a purchaser to the full 10-day wait once a background check is complete.[6]

In March 2014, the District Court conducted a three-day bench trial. On August 25, 2014, the District Court found in favor of Plaintiffs, holding that

---

[5]    Individual plaintiff Jeff Silvester has a license to carry a concealed weapon issued by his local chief of police, ER 38:1-2, and plaintiff Brandon Combs has a valid Certificate of Eligibility, ER 39:10.

[6]    Plaintiffs also brought a claim under the Equal Protection Clause, arguing that the 18 statutory exemptions to the WPLs violate the Fourteenth Amendment. Because the court concluded that the WPLs violated the Second Amendment, it declined to reach the Fourteenth Amendment issues. ER 54:26-55:5. The Equal Protection claim would be ripe for initial determination in the event of a remand.

the WPLs were unconstitutional under the Second Amendment as applied to each of the three classes of Plaintiffs. ER 1-56, *Silvester v. Harris*, 41 F.Supp.3d 927 (E.D. Cal. 2014).

The District Court first held that the WPLs burden the Second Amendment right to keep and bear arms. "One cannot exercise the right to keep and bear arms without actually possessing a firearm," and due to the waiting period, a "purchased firearm cannot be used by the purchaser for any purpose for at least 10 days." ER 41:23-24. Furthermore, the waiting period "may cause individuals to forego the opportunity to purchase a firearm, and thereby forego the exercise of their Second Amendment right to keep and bear arms." ER 41:28-42:1.

The District Court then found that the State failed to show the WPLs "fall[] outside the scope of Second Amendment protections as historically understood or fit[] within one of several categories of longstanding regulations that are presumptively lawful." ER 42:3-7. The court further stated "[t]here is *no evidence* to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment" at the relevant time (either 1791 or 1868). ER 42:13-15 (emphasis added).

16

The District Court, applying intermediate scrutiny, then determined for each of the as-applied classes that the State failed to establish a "reasonable fit" in applying the full ten-day waiting period to Plaintiffs if the background check is complete prior to the tenth day. *See* ER 49:17-23; 52:16-22; 54:19-24. The WPLs therefore violated the Second Amendment as applied to the three classes of Plaintiffs.

The District Court ordered the State to modify its background check procedures to comply with its order, and stayed its ruling 180 days to give the State sufficient time to address the decision. ER 55:7-56:21. On September 22, 2014, the State filed a motion to amend the judgment, and, a week later, filed a motion for stay pending appeal. *See* ER 57-66. The District Court denied both motions. *Id.*

On September 24, 2014, the State filed a notice of appeal.

On December 9, 2014, the State filed an urgent motion to stay enforcement of judgment in this Court, Dkt. 15, which was granted, Dkt. 20.

## SUMMARY OF ARGUMENT

The District Court correctly held that the WPLs violate the Second Amendment as applied to the three classes of individuals, identified above, who are known by the State to possess a firearm. The WPLs burden conduct

17

protected by the Second Amendment. A citizen must wait ten days from the date of a firearm purchase until they can take possession.

Rather than contest these burdens, the State disputes that the WPLs even implicate the Second Amendment as a historical matter under *Heller*. But the State offered no evidence to demonstrate that waiting-period laws possess a historical pedigree even remotely sufficient to take them outside the scope of the Second Amendment. The State tries to sidestep this deficiency by contorting *Heller* and asserting a series of speculative claims and strained analogies in an attempt to recast the WPLs as "presumptively lawful" firearms regulations. These arguments do not withstand historical or logical scrutiny.

Turning to the constitutional analysis, the WPLs do not survive intermediate scrutiny, which requires the State to establish a "reasonable fit" between the ten-day waiting period and the two objectives proffered by the State. The first objective—and by far the most prominent one noted in the legislative history—is preventing prohibited persons from taking possession of firearms through the background check process. The State refuses to accept that *this lawsuit never challenged the background check process*: all subsequent purchasers in the as-applied classes remain subject to California's comprehensive background check. Once the check is complete, however, the State has confirmed that the purchaser may lawfully possess a firearm, and

this rationale does not support forcing the individual to wait the balance of the ten-day period. For the 20% of purchasers who are auto-approved within an hour, waiting the next 9 days and 23 hours is delay for delay's sake, which cannot withstand intermediate scrutiny.

As for the second objective, the State argues that the additional delay is justified to allow a "cooling off period" that prevents purchasers from committing impulsive acts of violence. Again, the State avoids the main point here: a ten-day delay is not a reasonable fit for achieving a "cooling off" period for persons known by the State to *already possess* a firearm. The State failed to produce evidence to show that a "cooling off period" prevents impulsive acts of violence by individuals who already possess a firearm. Indeed, one of the State's own studies is premised on the idea that purchasers *don't* already own a gun.

The State's main argument rests on speculation that subsequent purchasers "may" not still have their gun, but speculative justifications by definition cannot survive heightened scrutiny. The State's remaining arguments fail because they either ignore what the District Court actually found or invite this Court to overturn multiple factual findings as clearly erroneous, despite ample record support. Indeed, the State essentially seeks a retrial on appeal. *But see Fyock v. City of Sunnyvale*, 779 F.3d 991, 1000 (9th

Cir. 2015) (refusing to "re-weigh the evidence and overturn the district court's evidentiary determinations—in effect to substitute our discretion for that of the district court"). The judgment should be affirmed.

## STANDARD OF REVIEW

This Court reviews the constitutionality of a statute de novo, *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010), and it reviews "the district court's underlying factual findings following a bench trial for clear error." *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014) (citing Fed. R. Civ. P. 52(a)(6)). Rule 52(a)(6) "sets forth a 'clear command'" that "does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 836-37 (2015) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985), and *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982)). This standard "applies to both subsidiary and ultimate facts," *id.* at 837, "findings of historical fact," *King Mountain Tobacco Co., Inc. v. McKenna*, 768 F.3d 989, 992 (9th Cir. 2014), and "to the results of 'essentially factual' inquiries applying the law to the facts.'" *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).

Under the "clearly erroneous" standard, "[t]he determinations of the

district court must be upheld unless on review of all the evidence" this Court is "left with the 'definite and firm conviction that a mistake has been committed.'" *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879 (9th Cir. 2005) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). A reviewing court may not "reverse a lower court's finding of fact simply because [it] 'would have decided the case differently.'" *Easley*, 532 U.S. at 242 (quoting *Anderson*, 470 U.S. at 573). Indeed, the Supreme Court has emphasized that "when reviewing the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." *Teva Pham. USA, Inc.*, 131 S. Ct. at 837 (internal quotation marks and citations omitted).

Finally, this Court reviews a district court's injunction "for an abuse of discretion or an erroneous application of legal principles," mindful that the district court "has considerable discretion in granting injunctive relief and in tailoring its injunctive relief." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). "[A] district court has 'broad discretion to fashion remedies once constitutional violations are found.'" *LeMaire v. Maass*, 12 F.3d 1444, 1451 (9th Cir. 1993).

**ARGUMENT**

## I.     The District Court Properly Rejected DOJ's Various Arguments That This Is Not A Second Amendment Case.

Under the Ninth Circuit's familiar two-step Second Amendment inquiry, the first step "asks whether the challenged law burdens conduct protected by the Second Amendment." *Chovan*, 735 F.3d at 1136.[7] The State does not contest the District Court's conclusion that the WPLs burden—by delaying—the ability of citizens in the as-applied classes to acquire and possess firearms. ER 41:21-42:2.[8] Instead, it offers multiple arguments as to why the WPLs supposedly fall outside the scope of the Second Amendment. The State bears the burden on this question. ER 42:3-7 (citing, *inter alia*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), and *Chovan*, 735 F.3d at 1136-37).

---

[7]     The District Court was bound by *Chovan*, but Plaintiffs respectfully submit that Second Amendment claims should be judged by textual and historical analysis, not interest balancing. "In *Heller*, . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). *See Heller*, 554 U.S. at 634-35 (rejecting interest balancing).

[8]     Nor does the State dispute the District Court's finding that plaintiffs' possession of at least one firearm does not diminish their Second Amendment interest in connection with the purchase of another firearm. ER 42 n.33; *see also Heller*, 554 U.S. at 629 (availability of "other firearms" no justification for banning possession of handguns).

The State focuses its argument on *Heller*'s one-paragraph discussion that begins with the observation that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. The Court then noted that its holdings should not be understood to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. In a footnote, the Court referred to these as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

The State contorts *Heller* and perverts history in a series of attempts to dress up the WPLs as "presumptively lawful" firearms regulations. None of these arguments undermine the District Court's conclusion that the WPLs burden conduct protected by the Second Amendment.

### A. The Record Offers No Support For DOJ's Claim That The WPLs Fall Outside The Scope Of The Second Amendment As Historically Understood.

*Heller* instructs that Second Amendment analysis must be rooted in historical analysis, which begins with the era preceding the founding because the Second Amendment "codified a preexisting right." 554 U.S. at 592. *Heller*

23

went on to consider "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th Century." *Id*. at 605. As the Seventh Circuit has explained, the historical scope analysis "requires a textual and historical inquiry into original meaning" at the time of the founding through ratification of the Fourteenth Amendment; if "government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there." *Ezell v City of Chicago*, 651 F.3d 684, 701-03 (7th Cir. 2011) (citations omitted).

This Court's decision in *Jackson* likewise instructs that this inquiry looks for "persuasive historical evidence" as to "whether the challenged law falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected.'" *Jackson*, 746 F.3d at 960 (quoting *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011)).

The Supreme Court's First Amendment jurisprudence is instructive in this regard. The Court has explained that "without persuasive evidence" of a "long . . . tradition of proscription, a legislature may not revise the 'judgment [of] the American people,' embodied in the First Amendment, 'that the benefits of its restrictions on the Government outweigh the costs.'" *Brown*,

24

131 S. Ct. at 2734 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)). That same rationale applies with equal force to the Second Amendment, which "[l]ike the First [Amendment], . . . is the very *product* of an interest-balancing by the people." *Heller*, 554 U.S. at 635 (emphasis in original). "The Constitution is not a document 'prescribing limits, and declaring that those limits may be passed at pleasure.'" *Stevens*, 559 U.S. at 470 (quoting *Marbury v. Madison*, 1 Cranch 137, 178 (1803)).

To that end, the District Court found that "Defendant has identified *no laws* in existence at or near 1791 or 1868 that imposed a waiting period of *any* duration between the time of purchase and the time of possession of a firearm." ER 17:3-5 (emphasis added). Further, the State "identified no historical materials at or near 1791 or 1868 that address government imposed waiting periods or the perception of government imposed waiting periods in relation to the Second Amendment." ER 17:6-8. The State cannot dispute these findings. Instead, it offers variations on strained historical analogies that this Court has previously rejected.

> **1. DOJ Cites No Government Restrictions Remotely Similar To A Waiting Period At The Relevant Times.**

First, the State argues that a waiting-period law falls outside the scope of the Second Amendment because, in the Founding Era, the government "could *temporarily* deprive law-abiding people" from possessing or using

guns. AOB 28 (emphasis in original). The only two examples provided, however, are wholly different from a waiting period law.

First, the State cites the statement in *Kachalsky v. Cnty of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012), that "[b]y 1785, New York had enacted laws regulating when and where firearms could be used, as well as restricting the storage of gun powder." Notably, *Kachalsky* found this pedigree of regulation insufficient to conclude that the modern-day concealed-carry licensing scheme at issue in the case fell outside the Second Amendment: "Analogizing New York's licensing scheme (or any other gun regulation for that matter) to the array of statutes enacted or construed over one hundred years ago has its limits." *Id*. at 92.

Nor are these supposed analogues remotely similar to WPLs. Although the State does not identify the content of the use-restriction law referenced in *Kachalsky*, it appears to be the same law, discussed in *Heller*, allowing the imposition of fines on persons who fired a gun "in certain places (including houses) on New Year's Eve and the first two days of January." *Heller*, 554 U.S. at 632. That sort of restriction has nothing to do with, and is nothing like, an across-the-board waiting-period law. *Id*. This Court rejected a similarly strained analogy in *Jackson*, 746 F.3d at 963 (rejecting attempt to analogize colonial-era gunpowder storage requirements to modern handgun storage

requirement), and this attempt fares no better.

Second, the State argues that founding era "impressment" laws, "by which the government temporarily impressed private firearms into military service, in times of public danger," AOB 28, is another "temporal restriction" showing that a waiting period law would have been understood to fall outside the Second Amendment. But this sort of doomsday rule is utterly different in kind from a WPL. The State's own materials demonstrate the folly of analogizing an impressment law to a WPL:

> Because there was no standing army, the national defense depended upon an armed citizenry capable of fighting off invading European powers or hostile Native tribes. With national defense becoming too important to leave to individual choice or the free market, the founders implemented laws that required all free men between the ages of eighteen and forty-five to outfit themselves with a musket, rifle, or other firearm suitable for military service.

Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 113 (W.W. Norton & Co. 2011) (State's Mot. to Take Jud. Notice, Ex. C). In this context, it is inconceivable that the same government *requiring* universal gun ownership among adult males would have considered enacting a separate law requiring those already-armed citizens to wait ten days before taking another firearm home from a gun merchant.

In sum, the State has failed to present persuasive evidence that WPLs fall outside the scope of the Second Amendment as historically understood.

27

### 2. DOJ Cannot Rely On Non-Governmental Impediments To Purchasing Guns To Show The Understanding Of A Constitutional Limitation On Government Action.

In the absence of a historical pedigree of similar regulation, the State falls back on a series of tenuous, speculative arguments concerning early American life. Even if there was no government-imposed waiting period, the State argues, some "frontiersmen" had to travel long distances on horseback to get to a store to buy a gun in the 18th century, and the store "may or may not have carried firearms and . . . was typically closed during the entire harvest season." AOB 31.[9] Dubbing this a "built-in natural waiting period" for rural citizens, the State concludes that "our arms-bearing ancestors" would not "pursue a lawsuit like the present case," so therefore a government-imposed WPL falls outside the Second Amendment. *Id*.

This novel argument fails in several respects. Simply put, the retail stocking practices of frontier merchants—and their decisions about which months to open their doors for business—have nothing to do with the scope

---

[9]    The Opening Brief cited the reference to this hardy frontiersman's trips to the trading post in *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1152 (9th Cir. 2013), but ignores that the point of the reference was to emphasize the universal expectation that the pioneer *would be carrying* a gun to and from the trading post. *See Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012) ("en route" to and from the trading post, "one would be as much (probably more) at risk if unarmed as one would be in one's home unarmed").

of the Second Amendment, for it is only *governmental* intrusions on individual rights that the Constitution forbids. *See*, *e.g.*, *Florida Retail Fed'n, Inc. v. Atty. Gen. of Fla.*, 576 F.Supp.2d 1281, 1295 (N.D. Fla. 2008) ("[T]he constitutional right to bear arms restricts the actions of only the federal or state *governments* or their political subdivisions, not private actors"). *Cf. Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The First and Fourteenth Amendments are limitations on state action, not on action by the owner of private property used only for private purposes."). In short, there is no evidence that a frontier retailer would tell the weary frontiersman: "Sorry, sir, the State code tells me you can't take this revolver home with you for 10 days." That is because waiting-period laws are modern creations that came long after the closing of the frontier.[10]

### B. The WPL Does Not Fall Within The Categories Of "Presumptively Lawful" Regulations Mentioned in *Heller*'s Footnote 26.

The State makes a passing argument that the WPL falls within two of the "presumptively lawful regulatory measures" identified in *Heller*: (1) "conditions and qualifications on the commercial sales of arms" and (2)

---

[10]   The argument also ignores the vast majority of citizens who, by definition, did not live on the "frontier" of inhabited land. If Davy Crockett lived down the block from the gunsmith, he could have walked to the store and taken home his rifle the same day.

prohibitions on possession by "felons and the mentally ill." 554 U.S. at 626-27. The WPLs fall into neither category.

      **1.**    **This Case Does Not Implicate *Heller*'s Reference To "Conditions And Qualifications On The Commercial Sale Of Arms."**

The State argues fleetingly that the WPLs "rank among *Heller*'s presumptively lawful 'commercial conditions' laws." AOB 33. It cites no Ninth Circuit case as support for its argument. The District Court concluded that the 10-day waiting period did not "qualify as a commercial regulation." ER 42:16-43:14 (discussing *Nordyke v. King*, 681 F.3d 1041, 1043 (9th Cir. 2012) (en banc), for the meaning of "acceptable commercial regulation" within the meaning of *Heller*).

If the State's expansive theory were correct, every single law or regulation touching on the sale of firearms that falls short of a complete prohibition on possession would fall outside of the Second Amendment. This is an illogical contortion of *Heller*. As the Third Circuit has explained:

> Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment. . . . If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of arms. Such a result would be untenable under *Heller*.

*United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010).

      Finally, it is unclear why the State cites the National Labor Relations

Act's requirement that unions provide 60 days' notice before striking, 28 U.S.C. § 158(d), and the California Family Code's rule requiring the passage of six-months before judgment can be entered in a marital dissolution case. Cal. Fam. Code § 2320(a). AOB 33-34. Neither of these laws is a "condition" or "qualification" on commerce relating to a constitutionally protected right.

### 2. The WPLs Are Not Prohibitions On Possession By Felons Or The Mentally Ill.

The State makes an even more perfunctory attempt to argue that, since the WPLs "facilitate[s] the enforcement" of the prohibitions on the possession of firearms by felons and the mentally ill, so therefore they are beyond scrutiny based on *Heller*'s statement that its decision did not impact the prohibitions *themselves*. 554 U.S. at 626. It cites no authority for this elasticizing of *Heller*, and Appellees are aware of none.

### C. There Is No Separate Second Amendment Safe Harbor For "Longstanding" Regulations.

The State next argues that, because California has had a waiting-period law in one form or another since 1923, the WPLs falls within a separate, general category of "longstanding regulations" that are outside the scope of the Second Amendment. AOB 35-38. Not so.

This is a misreading of *Heller*. The Court did not create a constitutional safe harbor for "presumptively lawful" regulatory measures unmoored to

searching historical analysis. In response to Justice Breyer's criticism that the Court failed to provide "extensive historical justification for those regulations of the right that we [the majority] describe as permissible,"[11] the majority explained: "[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . . [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635.

Thus, each firearms regulation (even "presumptively lawful" ones) must be judged based on its "historical justifications" to determine whether it falls within the scope of the Second Amendment right. To this end, *Heller* instructs that historical analysis of the scope of the Second Amendment is judged against the "public understanding" in the period after ratification through the end of the 19th century. 554 U.S. at 605; *see id.* at 605-19 (surveying various historical sources). This is because "the Second Amendment . . . codified a pre-existing right," *id.* at 603, and "constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ." *Id.* at 635. *See also McDonald*, 561 U.S. at 802 (Scalia, J., concurring) (the "traditional restrictions go to show the scope of

---

[11]     *See Heller*, 554 U.S. at 721 (Breyer, J., dissenting).

the right"); *Chovan*, 735 F.3d at 1137. In short, "longstandingness" is not a stand-alone exemption.

In any event, *Chovan* forecloses the State's attempt to rely on 20th-century gun regulation to determine the historical scope of the Second Amendment. There, this Court observed federal restrictions on possession of firearms by violent offenders traceable to 1938 were not "so longstanding" that they fall outside the scope of the Second Amendment. 735 F.3d at 1137. Fifteen more years does not a "longstanding" analogue make, particularly when the WPL enacted in 1923 was only *one day rather than ten*, and the waiting period was not extended to three days until 1955, *supra*.

*Amicus* Everytown USA argues that *Heller* itself shows that regulations need not predate the 20th century to be "presumptively lawful," since the "first felon prohibitions in state law, for example, arose in the early 20th century" and the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938." Everytown *Amicus* Br., p. 15 (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)); *id*. at 15-16 (regarding bans on possession by mentally ill).

This argument conveniently ignores the wealth of historical evidence confirming that felon-in-possession statutes codify restrictions that were understood since the Founding to be consistent with the Second Amendment.

33

Indeed, *Skoien* cites The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents (1787), which confirmed that "citizens have a right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Skoien*, 614 F.3d at 640. And *Skoien* observed that "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Id*. (citing multiple sources). Likewise, *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), which the State also cites, refers to multiple sources demonstrating the "longstanding practice," traceable to the Founding, "of prohibiting certain classes of individuals from possessing firearms—those whose possession poses a particular danger to the public." *Id*. at 15-16 (citations omitted).[12]

The State also makes too much of the statement in *Fyock* that "early twentieth century regulations might nevertheless demonstrate a history of

---

[12]     *See also* Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms. . . . Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent."); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].").

longstanding regulation if their historical prevalence and significance is properly developed in the record." 779 F.3d at 997 (citing *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) (*BATFE*)). *BATFE* confirms that the meaning of "historical prevalence and significance" is no different than the historical analysis discussed above. In considering a challenge to the 20th century federal prohibition on selling handguns to persons under the age of 21, the Fifth Circuit spent several pages reviewing historical sources regarding limits on firearm possession by minors, from the Founding through the nineteenth century. 700 F.3d at 200-04 ("there is considerable historical evidence of age- and safety-based restrictions on the ability to access arms," so "[m]odern restrictions" are "firmly historically rooted"). *Fyock*, in any event, *skipped the historical scope step entirely* since neither party addressed the issue in the district court. 779 F.3d at 997.

*Fyock*'s dicta does not overturn the historical analysis required by *Heller*, *Jackson*, and *Chovan*. Here, the record reveals nothing remotely similar to a waiting period law in the United States prior to 1923.

*    *    *

The Opening Brief provides no basis for revising the District Court's conclusions at *Chovan*'s first step. The WPLs burden conduct protected by the Second Amendment.

## II.     The District Court Correctly Found That Applying The Waiting Period Laws To The As-Applied Classes, After A Background Check Is Passed, Does Not Survive Intermediate Scrutiny.

The second *Chovan* step determines and applies the appropriate level of constitutional scrutiny. *Chovan*, 735 F.3d at 1137-40; *Jackson*, 746 F.3d at 963-66. The State spends a surprising amount of time arguing that intermediate scrutiny (rather than strict scrutiny) should apply, considering that the District Court did not apply strict scrutiny; Plaintiffs argued below that it was not necessary to consider strict scrutiny since the WPLs cannot satisfy intermediate scrutiny. ER 44:16-23.

When it comes to applying intermediate scrutiny, this Court has recognized that courts "have used various terminology to describe" the standard, but "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at 1139).

The District Court concluded, and plaintiffs did not dispute, that "California has important interests in public safety/preventing gun violence

36

and preventing prohibited individuals from obtaining firearms." ER 44:24-45:5. Thus the District Court focused its analysis on the multiple reasons why applying the Waiting Period Laws to the as-applied classes of existing gun owners—by making them wait for the entire ten-day period after they pass a background check, which often happens in a matter of minutes—does not constitute a "reasonable fit." Before addressing those arguments, however, it is worth reviewing the standards underlying the "reasonable fit" test, since most of them are nowhere mentioned in the Opening Brief.

### A. The District Court Relied On The Applicable "Reasonable Fit" Standards Imported From First Amendment Doctrine, Which The Opening Brief Largely Ignores.

The Ninth Circuit has repeatedly acknowledged that the intermediate scrutiny test used to evaluate Second Amendment claims is imported from First Amendment cases. *See Chovan*, 735 F.3d at 1138-39 (agreeing with multiple courts' reliance on First Amendment standards); *Jackson*, 746 F.3d at 965 (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (time, place, and manner restrictions), and *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (commercial speech restriction)).

These First Amendment authorities explain how the "reasonable fit" test is applied, and the Opening Brief largely ignores them. The District Court cited two additional First Amendment-based aspects of the reasonable-fit test,

both of which confirm that the test requires evidence of an actual effort by the government to tailor a regulation in light of the burdens it imposes on constitutionally protected activity—evidence that is utterly lacking here:

1.    *Narrowly tailored/carefully calculated*. The District Court correctly stated that, "[f]or there to be a 'reasonable fit,' the regulation must not be substantially broader than necessary to achieve the government's interest." ER 41:9-13 (citing *Reed v Town of Gilbert*, 707 F.3d 1057, 1074 n.16 (9th Cir. 2013) (sign regulation); *Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1004 (9th Cir. 2007) (operating restriction on adult video booths), and *Marzzarella*, 614 F.3d at 98 (Second Amendment challenge to federal serial number requirement)).

This is another formulation of the oft-cited standard described in *Fox*, where the Supreme Court explained that the "fit" must be "in proportion to the interest served," "that employs not necessarily the least restrictive means but . . . a means *narrowly tailored to achieve the desired objective*." *Fox*, 492 U.S. at 480 (emphasis added). The "cost" of the restriction must be "carefully calculated." *Id.*; *see Jackson*, 746 F.3d at 965 (quoting *Fox*).

2.    *Speculation or conjecture insufficient*. The District Court further stated correctly that, under intermediate scrutiny, the "government cannot rely on 'mere speculation or conjecture'" to establish a reasonable fit. ER 41:13-16

(citing *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (striking down commercial speech regulation), and *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (government may not rely on "anecdote and supposition")); *see also Valley Broad. Co. v. United States*, 107 F.3d 1328, 1331 (9th Cir. 1997) (same). As a corollary to this evidentiary requirement, a regulation "may not be sustained if it provides only ineffective or remote support for the government's purpose,' rather there must be an indication that the regulation will alleviate the asserted harms to a 'material degree.'" ER 41:16-19 (citing *Edenfield*, 507 U.S. at 770-71, and *Valley Broad.*, 107 F.3d at 1334).

\*   \*   \*

The State generally ignores these concepts and chooses instead to focus entirely on *Fyock*'s fleeting statement that "[the city] was entitled to rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests." 779 F.3d at 1000 (citing *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 52 (1986) (evaluating zoning restriction on adult theaters under intermediate scrutiny)). But *City of Renton* itself undermines the State's approach, as it stressed that the zoning ordinance at issue there was "'*narrowly tailored*' to affect only that category of theaters shown to produce the unwanted secondary effects," 475 U.S. at 52 (emphasis added)—a finding that

cannot be made here.

Moreover, when applying intermediate scrutiny, the court focuses on a restriction's actual purpose, rather than any conceivable or hypothetical purpose advanced by the government. A court will not "turn away if it appears that the stated interests are not the actual interests served by the restriction." *Edenfield*, 507 U.S. at 768 (citing *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982) (state "failed to establish that the alleged objective is the actual purpose underlying" the statute)). In a similar vein, the portion of *Renton* quoted in *Fyock* refers to the government's leeway in marshaling evidence to identify and remedy a substantial problem, not evidence it can use as a post-hoc justification for past action. *Renton*, 475 U.S. at 51-52 (city is not required "*before enacting such an ordinance*, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses") (emphasis added); *see id.* at 44 (detailing city planning commission's investigation). The State's reliance on *City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425 (2002), fails for the same reasons. As in *Renton*, the city conducted a comprehensive study, *then* relied on that study to design an ordinance to remedy the problems identified in the study. 535 U.S. at 430.

40

By contrast, the evidence the State uses to defend the WPLs was not relied upon by the Legislature when enacting the law, it is only being used to prop-up the law after the fact. This is the hallmark of rational basis review. As the Supreme Court stressed in *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002): "[W]e have generally only sustained statutes on the basis of hypothesized justifications when reviewing statutes merely to determine whether they are rational."

Indeed, the State argues as if the "reasonable fit" test is indistinguishable from a rational basis test, complaining that the District Court should have "accept[ed] that a reasonable legislature could believe" that the WPL reduced handgun violence based on the evidence at trial, AOB 52.[13] But *Heller* emphatically instructed that rational basis is not the standard for reviewing Second Amendment claims. 554 U.S. at 629 n.27. Thus, while the State may have leeway in marshaling evidence in identifying a "substantial government interest" and tailoring a regulation to serve such an interest, the government is not afforded the same leeway when it relies on evidence to

---

[13] Under the rational basis test, "[t]his lowest level of review does not look to the actual purposes of the law. Instead, it considers whether there is some conceivable rational purpose that [the legislature] could have had in mind when it enacted the law." *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014); *see also id.* (noting that the Supreme Court has "emphasized that deference to post-hoc explanations was central to rational basis review") (citation omitted).

develop a (hypothetical) rationale after the fact to establish a "reasonable fit."[14]

In any event, the District Court here *did* consider nearly all of the studies submitted by the State and determined that they did not establish a reasonable fit.[15] The State simply wants a retrial on appeal.

The State also claims to analogize waiting periods in other contexts, AOB 52-53, but two of its cases, *Zablocki v. Redhail*, 434 U.S. 374 (1978) (striking down requirement of court approval for certain marriages), and *Burdick v. Takushi*, 504 U.S. 428 (1992) (upholding Hawaii's ban on write-in ballots), do not even involve waiting periods.

Cases involving the minimum period of time between voter registration and election day are poor analogies for many reasons, not the least of which is Article I, § 4 of the Constitution, which expressly grants states the power to regulate "[t]he Times, Places and Manner of holding elections." The Supreme Court has further recognized that, "as a practical matter, there must be a

---

[14]    The State makes a curious passing argument that it should be afforded additional deference because of its police power. AOB 25-26. But it cites no authority to explain how or why its police power alters the intermediate scrutiny analysis, or otherwise provides cover for the State to infringe fundamental individual rights.

[15]    We address the studies and resources for which judicial notice was denied in the separate response to the Motion to Take Judicial Notice.

substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

As for *ACORN v. Bysiewicz*, 413 F.Supp.2d 119 (D. Conn. 2005) (rejecting claim that right to vote compelled right to election-day registration), the court there stressed the technological limitations justifying the state's need to monitor fraud that do not exist here, *id.* at 154 (noting database crashes at end of registration period); again, the background check must still be completed in every instance.

### B. The District Court Properly Concluded That The Background Check Rationale Did Not Justify Waiting Ten Days For Checks That Are Completed In Less Time.

The District Court found, based on DOJ testimony, that roughly twenty percent of all background checks are "auto approved"—meaning the purchaser's application has been run through the multiple databases discussed above to confirm they are not prohibited from purchasing a firearm—in a matter of minutes. ER 30:1-5 (citing SER 2:13–15, 10:22–11:3, 5:1–6, 12:22–14:15). The State essentially ignores the basis on which this case was tried: When anyone in one of the as-applied classes tries to buy a firearm, *the background check must still be approved*, whether it takes a few minutes or the full 30-day period allowed by statute. Thus, when manual work is actually

43

required to complete a check, *see* AOB 11, that work will still take place.

The District Court concluded that, once a subsequent buyer's background check has been approved, however, "conducting a background check is no longer a justification for the 10-day waiting period because the DROS applicant has been approved as determined by a completed background check." ER 46:8-11. Thus, while the background check *itself* may constitute a reasonable fit for addressing the harm of allowing prohibited persons to purchase firearms, requiring the purchaser to wait after the check has taken place is a substantially broader "fit" than necessary to achieve the objective. *Cf.* AOB 50 (acknowledging that WPL may not be "substantially overbroad"). The additional time is not "carefully calculated" to achieve the objective, since the objective has already been achieved. *Jackson*, 746 F.3d at 965.

Instead of accepting this victory—the State interest in conducting and completing a background check will continue to be vindicated in every purchase—the State tries to move the goalposts. It argues that, even if a background check is completed before the expiration of the 10-day waiting period, it should still have the full 10 days because it *might* receive information during the remaining time that would cause it to re-evaluate the purchaser's eligibility. AOB 49.

The District Court properly rejected this argument on a number of

grounds, all of which apply to each of the as-applied classes.

*First*, the District Court found that, in fact, completed background checks are not routinely "re-run" as the Opening Brief tries to suggest.[16] Indeed, the District Court traced almost verbatim the testimony of DOJ Bureau Assistant Bureau Chief Steven Buford in concluding that:

> The ***only time*** *a CIS Analyst would review an auto-approved DROS application* is if BOF is contacted about a particular DROS applicant by an outside source, such as a law enforcement officer or a medical professional. *See* [Tr.] 199:8-200:1. [SER 6:8-7:1] Outside requests to further investigate an auto-approved DROS application occur "occasionally." *See id.* at 199:14-16. [SER 6:14-16] No evidence was presented to quantify or explain what is meant by "occasionally."

ER 30:6-10 (emphasis added); *see also* ER 46 n.34 ("[n]o evidence indicates that a material number of auto-approved DROS applications are ever rechecked").

*Second*, the court further found that:

> 20% of all DROS applications are auto-approved in a very short period of time, and they normally are not reviewed or rechecked at any time. Finally, of the approximately 99% of DROS applications that are approved, no new disqualifying information was obtained during the 10-day waiting period. Of the approximately 1% of DROS applications that are denied, there is

---

[16]    The Opening Brief states that "[a]s noted above, the 10-day period also affords CIS Analysts time to re-run certain background checks to make sure they are based on the most up-to-date information." AOB 49. But what the State actually "noted above" was that "re-runs" only occur when the DROS application was not auto-approved, required manual review, and sat around "awaiting processing by a CIS analyst for a few days." AOB 11-12.

> no evidence regarding when in the 10-day waiting period that the disqualifying information was obtained, i.e., was the disqualifying information obtained during the initial BFEC or was it obtained late in the process as part of a re-check.

ER 46:15-21. The Opening Brief does not contest any of these findings as erroneous, much less clearly erroneous, and they are amply supported in the record. ER 30:1-2; *see* SER 2:13-15 (20% auto-approval), SER 3:8-4:1 (detailing review procedure); ER 28:13-29:6 (99% of applications are approved).

*Third*, in light of these facts, the District Court found that "[r]equiring an approved DROS applicant to wait the full 10-days [when the applicant falls in one of the three as-applied classes] on the chance that new information might come in, is unduly speculative and anecdotal." ER 46:21-24. This conclusion is plainly correct, and the State does not even address it.

*Fourth*, in response to the admittedly speculative concern that disqualifying information could arrive after an initial approval, the Court noted that the same could be said for any timeframe. The important point, the Court stressed, is that the law requires the buyer "to pass the background check, [and] not to pass the background check every day for 10 straight days," ER 46:14-15, and the evidence shows successive checks are not made in any event. Indeed, the record contains no evidence whatsoever that the 10-day waiting period was established to allow time for post-approval reporting. To

46

the contrary, the 10 day waiting period was reduced from 15 days on the legislative assumption that automation and computerization of the background check process increased the speed and efficiency of screening the eligibility of purchasers, *supra*, and the record confirms that this automation has progressed to the point that many checks can be approved in a matter of minutes.

*Fifth*, the Court found that, if the speculative concern of post-approval disqualifying information comes to pass, the Legislature established a separate program to address that risk: The APPS system "is designed to retrieve such firearms from prohibited persons. The APPS system acts as a safety net for individuals who have been previously approved to possess a firearm, but who later become prohibited." ER 46:27-47:2.

The State's response: The APPS system isn't administered well enough to be trusted. Contrary to the State's claim that the "only on-point evidence" shows the system is "incomplete,"[17] however, the evidence shows that if one

---

[17]    In fact, the only testimony cited in the Opening Brief notes the DOJ's policy preference that fewer guns be added to the list, not that the list is incomplete. AOB 13, citing ER 137:13-138:5. This preference is perhaps understandable in light of the controversy that has resulted from DOJ's delays in implementing the program, but such policy preferences are surely no basis for disturbing the District Court's findings. *See* L.A. Times, *Editorial*, *State falls behind on efforts to keep guns out of the wrong hands*, May 12,2015, online at http://lat.ms/1e2pvfm; Cal. DOJ, Office of the Atty. Gen., *Senate*

of the members of the as-applied classes becomes prohibited and the APPS law is followed,[18] their name will appear in the APPS database to notify DOJ that their gun should be retrieved. Cal. Penal Code §§ 30000 (purpose is to establish file to cross-reference persons who appear in CFIS as owning a firearm and become prohibited), 30005 (upon entry into "any department automated information system" used to identify prohibited persons, the department "shall determine if the subject has an entry" in CFIS). Thus, the APPS system acts as a "safety net" if someone becomes prohibited from possessing a firearm, as confirmed by the State's various databases—including the AFS, which ensures that individuals in each of the as-applied classes are within its reach. ER 34:21-23 (citing SER 24:17-25:10); *see also* SER 29:19-25 (CCWs with firearms in AFS are subject to APPS); SER 29:7-9, 29:3-5 (APPS is linked to State's databases, including AFS). As Bureau Chief Stephen Lindley explained:

> Let's say that last night, I was arrested for domestic violence. Taken down to county jail, my fingerprints were rolled. This morning, DOJ would have been notified by our own system

---

*Bill 140, Legislative Report Number One, Armed and Prohibited Persons System* (2014), online at http://bit.ly/1G7TUUD.

[18]    This Court presumes that state actors will follow the law. *Brown v. Plata*, 131 S. Ct. 1910, 1965 (2011) ("[I]n the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.") (citation omitted); *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (same).

[APPS] that I was arrested for domestic violence, which potentially could be a prohibiting offense . . . .

SER 26:15-19.

Indeed, since individuals in the as-applied classes are already listed in the relevant databases, if they become prohibited (inside or outside the 10-day period), DOJ would be obliged to retrieve all of their guns in any event. Regardless, the District Court credited the testimony that DOJ would prefer to ignore, and there is no basis for disturbing its finding.

*Sixth*, as to the CCW and COE as-applied classes, the District Court found that the "rap back program acts as a further safety net with respect to California criminal conduct" by such individuals. ER 50:18-19. The Opening Brief does not, and cannot, dispute this finding.

In sum, the State provides no basis for reversing the District Court's conclusion, supported by multiple separate findings, that the WPL is not a "reasonable fit" for purposes of the background check rationale.

### C.   The District Court Properly Concluded That Applying The Ten-Day Waiting Period To Purchasers Who Already Own A Firearm Is Not A Reasonable Fit Under The Cooling Off Rationale.

Bureau of Firearms Chief Steve Lindley testified that the "only" reason not to release a firearm after a background check has been approved is the "cooling off" rationale, and the District Court adopted this as a finding. ER

49

46:1-7; *see* SER 29:9-18. The "'cooling off period,' seeks to limit a person's access to a firearm." ER 47:5-6.

But this case concerns only individual purchasers who already have access to a firearm. Applying basic common sense in light of the record, the District Court concluded that "[i]f a person already possess[es] a firearm, then that person will generally have access to that firearm and may commit impulsive acts of violence with it," so therefore "a waiting period for a newly purchased firearm will not deter an individual from committing" such impulsive acts. ER 47:9-14. The State's evidence and arguments could not overcome this simple point:

- The State's scaremongering argument that a subsequent purchaser "may choose to acquire new or additional firearms to commit acts of violence more effectively or heinously," AOB 47, has no support in the record. In fact, the District Court sustained the plaintiffs' objection to the testimony cited by the State as support for this proposition, ER 146:1-23, on the grounds that it was speculative and hypothetical. ER 146:24-147:8. When the State's witness offered what he thought was a concrete example of this situation, ER 147:10-20, it turned out that the perpetrator of the crime had, in fact, followed the applicable waiting-period law for the purchase of the handgun used in the crime. SER 16:25-22:23. The State offered "no evidence

50

that a 'cooling off period' . . . prevents impulsive acts of violence" by persons who already own a gun. ER 47:11-12.

• The State claims that "[e]ven Appellees conceded that a waiting period 'may have a deterrent effect on impulsive suicides or homicides,'" AOB 47, yet it omits that Appellees plainly and conspicuously made this "concession" in the context of first-time buyers only. *See* Trial Ct. Dkt. 91 (Plf.'s Findings and Orders After Bench Trial) at 21:9-21:22. ("But the Plaintiffs are not challenging the WPL for first time gun-buyers who presumably don't have immediate access to a firearm. In that circumstance, being required to wait 10 days . . . may have a deterrent effect . . . .").

• While the State offered various studies about the effect of cooling-off periods, they all "seem to assume that the individual does not already possess a firearm." ER 47:15-18. And the Opening Brief fails largely to distinguish between first-time and subsequent purchasers. *See* AOB 13-14, 46-47.[19] One such study, however, was not the least bit ambiguous. The

---

[19] The State's only response to this finding is that one of these studies refers to "reducing the availability of lethal instruments" during the cooling-off period, which supposedly "implies" a public-safety benefit to keeping a second firearm away from suicidal people. AOB 48. But "reducing the availability of lethal instruments" in this context surely means that first-time buyers already have access to *other* "lethal instruments" in their homes, such as material with which to hang themselves. Indeed, the very next sentence following the cited passage confirms this: "Psychiatric and penal institutions have long recognized the importance, in all age groups, of restricting access

51

evidence that supposedly shows it is "well-established that waiting-period laws correlate with reductions in suicides by elderly people," AOB 13, states: "For a suicidal person *who does not already own a handgun,* a delay in the purchase of one allows time for suicidal impulses to pass or diminish." ER 253 (emphasis added). The State's evidence thus supports the District Court's conclusion.

- The minimal pieces of legislative history mentioning a cooling-off rationale make no reference to *subsequent* purchases by existing gun owners, and neither do the various studies proffered in the litigation.

In short, the cooling off rationale makes no sense here and the State's evidence does not establish a "reasonable fit."

The State makes a few additional arguments to chip away at some of the bases for the District Court's conclusion. None of them succeed.

### 1. The State Clings To Its Argument That Subsequent Purchasers May No Longer Have Their First Gun And Ignores The District Court's Solution To This Supposed Dilemma.

The State argues that the cooling-off rationale makes sense for subsequent purchasers because a "person's firearms may be broken, loaned out, lost, stolen, or lacking in ammunition." AOB 47. No doubt this scenario

---

to lethal means of suicide for newly admitted and potentially suicidal inmates." ER 263.

"may" occur, but the State offered no evidence whatsoever about the extent to which people in the plaintiff classes purchased subsequent guns when they did not have access to any of their previously-acquired guns. And there is certainly no legislative history addressing this issue.

The first piece of testimony cited as support for the State's theory establishes only that at certain times Plaintiff Silvester did not have access to "one or more" of his guns, ER 95-96, and does not involve any attempt to purchase another gun. It is unclear why the State cites the second piece of testimony as supposed support, ER 95:19-96:10, 108:20-22, as it expresses the unremarkable point that guns are sometimes lost or stolen.

This entire line of argument is really an expression of concern that the District Court's remedy might be abused—maybe members of the as-applied class will try to get a gun in less than 10 days when they no longer have their previous gun—rather than an argument about why the law is a "reasonable fit." There is no evidence to support this scare tactic.

The District Court called the State's bluff in any event. If the State is concerned that members of the as-applied class will attempt to purchase a firearm when, in fact, they no longer have their registered guns, DOJ could simply modify the DROS process to require that subsequent purchasers

confirm that they still have the gun identified in the AFS system. ER 48 n.36.[20] Indeed, DOJ can avoid its supposed concern entirely by requiring members of the as-applied classes to demonstrate to a firearm dealer that they still possess the firearm in the AFS system before taking possession of their newly-purchased firearm. The point of this lawsuit is to avoid senseless application of the WPL, not to allow people who no longer have guns to evade the waiting period.

The State's "what-if" scenarios put its further arguments in the proper context. The State argues that the District Court committed clear error when it purportedly found that "AFS is, in effect, a firearm registry, such that any person whose name is associated with a firearm transaction listed in that database must be assumed actually to possess the firearm presently." AOB 55. In other words, the State argues that DOJ's AFS database can't be trusted, and instead it should be assumed that individuals listed there really don't have access to their gun(s). The State even disputes the truism that "if a person already possess[es] a firearm, then that person will generally have access" to it. ER 47:9-10; AOB 57.

The District Court correctly found that, in fact, law enforcement

---

[20]    Furnishing false information on the DROS application is a crime. Cal. Penal Code § 28250.

throughout California rely on the AFS database in performing their work. ER 22:6-9 (citing SER 6:19-22, 7:15-21, 23:3-20.) *See supra*, n.6; SER 30-34 (detailing the "tactical," "investigative," and "prosecutorial" uses of AFS). Of course no database is perfect, and (as the State itself argues) perfection is not the constitutional standard for either side of this litigation. The District Court's ruling recognized this:

> It is true that the AFS system does not contain every firearm in circulation in California. However, if a person has a weapon that appears within the AFS system database, and that person's application is otherwise approved, Defendant has not explained why it should be presumed that such an individual no longer possesses the firearm. Such a presumption is not supported by any identified evidence.

ER 48:7-11.

The State's speculative concern that gun owners "may" no longer have their guns is no basis for establishing a reasonable fit. An overbroad policy justified by speculative, *post-hoc* theories rather than evidence cannot satisfy intermediate scrutiny. *Edenfield*, 507 U.S. at 770-71, *Valley Broad. Co.*, 107 F.3d at 1331.

### 2. The Court's Observations About The Goals Of Various Firearms Laws Were Not Erroneous Factual Findings About Gun Owner's "Personality Traits."

The State next claims that the District Court clearly erred when it supposedly found, as to persons whose guns are listed in the AFS database,

"that [their] possession demonstrates 'responsible gun ownership' justifying an exemption from the 10-day waiting period." AOB 55. It is sufficient to quote the District Court's ruling to rebut this assertion:

> If an individual already possess a firearm ***and then passes the background check, this indicates a history of responsible gun ownership***. There has been no showing that applying the 10–day waiting period to all individuals who already possess a firearm will materially prevent impulsive acts of violence.

ER 48:1-4 (citing *Valley Broad.*, 107 F.3d at 1334) (emphasis added). Thus, it is not mere "possession" that supports the District Court's reference to "responsible gun ownership." Rather, the District Court was accurately noting that the point of the background check is to reveal whether the applicant falls into a category showing they are *not* a "responsible" gun owner.

Similarly, the State argues that the District Court "made unsupported determinations that people with CCW licenses have certain positive personality traits such that there is no public-safety benefit in making them go through the waiting period." AOB 57. The State objects to the District Court's observation that "[t]he nature and unique requirements of CCW licenses are such that it is unlikely that CCW license holders would engage in impulsive acts of violence." ER 51:5-6.

This argument captures the essence of the State's appeal. The State argues that the WPL is a "reasonable fit" because it should be *presumed* that

56

(a) separate firearms laws cannot be trusted to achieve their intended purposes, or (b) individuals exercising Second Amendment rights probably are looking to skirt the law, or both. The District Court correctly rejected this cynical approach as impermissibly speculative to establish a "reasonable fit." ER 52:1-2.

Here, the District Court correctly noted that California requires CCW applicants to undergo an even more rigorous screening than an ordinary firearms purchaser. First-time CCW applicants, for example, must complete a "course of training" that may last up to 16 hours and "shall include instruction on at least firearm safety and the law regarding the permissible use of a firearm." Cal. Penal Code § 26165(a). CCW permits must be renewed every two years, at which point the permit holder must undergo additional training of "no less than four hours" on the same subjects. *Id*. § 26165(c). Moreover, CCW applicants, unlike ordinary purchasers, get fingerprinted, and are therefore subject to rap-back.

The State further dismisses the statutory mandate that CCW permit applicants establish "good cause," *id*. §§ 26150, 26155, on the ground that the panel opinion in *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2013), "relaxed the good-cause requirement statewide." *Peruta* is now being reconsidered by the *en banc* Court. The State ignores that *Peruta*'s resolution

57

will not affect the various *other* safety-based requirements that apply to CCW holders, nor the separate "moral character" requirement for a CCW permit, Cal. Penal Code §§ 26150(a)(1) and 26155(a)(1). And, in any event, the District Court confirmed that its entire discussion of CCW holders was cumulative to the analysis as to why the cooling-off rationale does not apply to individuals with firearms in the AFS system. ER 50-51. That analysis was amply supported by the record.

In light of the regulatory regime, and considering that CCW permit holders will still have to pass new background checks when purchasing a new firearm, the District Court rightfully concluded:

> If an individual has met the requirements for obtaining a CCW license, and thereby demonstrated that he or she can be expected and trusted to carry a concealed handgun in public for 2 years, it is unknown why that person would have to wait 10-days before being permitted to take possession of [a] newly purchased firearm.

ER 51:23-52:1. In the absence of any evidence to the contrary to support the State's argument—and none exists in the record—applying the WPL to CCW holders for "cooling-off" purposes is not a "reasonable fit."

### D. The State Does Not Appear To Contest The District Court's Finding That The "Straw Purchase Investigation" Interest Does Not Establish A Reasonable Fit.

The State makes no discernable attempt to argue that the District Court erred when it found the State's eleventh-hour "straw purchase investigation"

rationale for the WPLs did not support a reasonable fit finding. Instead, the State constructs an elaborate theory that the District Court's injunction will create "natural incentive" for members of the as-applied classes "to become straw purchasers." AOB 61. But this is no basis for disputing plaintiffs' entitlement to relief. Nor of course, is a concern that people will violate separate laws prohibiting straw purchases a basis to argue that the court abused its discretion in formulating the injunction.

## III. The Court Did Not Abuse Its Discretion In Fashioning The Injunction.

The State disputes that it can implement the few changes to the database review process in six months, as ordered by the District Court. Given the testimony by Assistant Bureau Chief Buford that such changes would be "simple," it would not be possible to find that the District Court abused its discretion when it gave the State six months to comply. ER 27:24-27 (citing SER 8:23) (Buford explained that "[i]t [the DROS background check system] could check to say yes or no whether a person has a COE or whether a person has a CCW. That's a simple check. It's a yes-or-no answer."); *see also* SER 8:11-9:24.

The State appears to argue that, if the judgment is affirmed, its compliance should nevertheless be "contingent on a sufficient appropriation

from the California Legislature." AOB 63. The State cites no authority for this demand, and "financial constraints may not be used to justify the creation or perpetration of Constitutional violations." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992) ("[F]ederal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights.").

Finally, two brief practical points in response to the State's request that it should not be required to modify the background check process to query whether the purchaser has a COE. AOB 59. First, the State could modify the DROS application to require a purchaser to state whether he or she has a COE (and provide the COE number). DOJ would then only need to verify that the purchaser has a valid COE, rather than query all applications.

Second, to the extent the COE-holding Plaintiff class is a subset of all individuals in the AFS database, DOJ could design its background check process so that it only checks whether a purchaser has a COE after it has confirmed that the purchaser has a firearm in AFS—again relieving it of the burden of checking for a COE when processing every application.

## CONCLUSION

For the reasons set forth above, the District Court's judgment should be affirmed in all respects.

Respectfully submitted,

Dated: May 26, 2015                    Benbrook Law Group, PC


By:  /s/ Bradley A. Benrbook
      Bradley A. Benbrook
      Counsel for Plaintiffs-Appellees

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees are aware of no related cases (as defined by Ninth Circuit Rule 28-2.6) pending before this Court.

Dated: May 26, 2015        Benbrook Law Group, PC


By:  /s/ Bradley A. Benrbook
     Bradley A. Benbrook
    Counsel for Plaintiffs-Appellees

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7) because it contains 13,677 words.

2.     This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced typeface

using Microsoft Word 2010 and Times New Roman size 14 font.

Dated: May 26, 2015                    Benbrook Law Group, PC


                                       By:  /s/ Bradley A. Benrbook
                                             Bradley A. Benbrook
                                       Counsel for Plaintiffs-Appellees

63

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 26, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 26, 2015              Benbrook Law Group, PC


By:  /s/ Bradley A. Benrbook
Bradley A. Benbrook
Counsel for Plaintiffs-Appellees