**No. 14-16840**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

JEFF SILVESTER, et al.,
Plaintiffs-Appellees,

vs.

KAMALA D. HARRIS,
in her official capacity as the Attorney General of California,
Defendant-Appellant.
_____

On Appeal from the United States District Court
for the Eastern District of California
Case No. 1:11-CV-02137-AWI-SKO
Hon. Anthony W. Ishii, Judge
_____

**BRIEF OF AMICUS CURIAE CRIME PREVENTION RESEARCH CENTER
IN SUPPORT OF PLAINTIFFS AND APPELLEES JEFF SILVESTER, ET AL.,
AND SUPPORTING AFFIRMANCE**

Filed with the Consent of All Parties
Pursuant to Fed. Rule of Appellate Procedure 29(a)
_____

John R. Lott, Jr., Ph.D.
CRIME PREVENTION RESEARCH
  CENTER
212 Lafayette Ave.
Swarthmore, Pennsylvania 19081
Telephone: (484) 802-5373
Email: johnrlott@crimeresearch.org
*Amicus Curiae*

George M. Lee (SBN 172982)
SEILER EPSTEIN ZIEGLER &
  APPLEGATE LLP
601 Montgomery St., Ste. 2000
San Francisco, California 94111
Telephone:  (415) 979-0500
Email: gml@sezalaw.com
Attorneys for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Crime Prevention Research Center is a non-profit corporation, which has no parent corporation.  It issues no stock, and therefore no publicly held company owns more 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................1

CONSENT TO FILE AND STATEMENT PURSUANT TO RULE 29(C) ..................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................2

ARGUMENT OF AMICUS CURIAE...................................................3

I.   No Evidence Exists in the Record or Elsewhere that a
     "Cooling Off Period" Has Any Beneficial Effects As
     Applied to the Three Classes of Plaintiffs Subject to the
     District Court Judgment...................................................3

     A.   The Studies Show No Beneficial Effect on Crime. ...................................3

     B.   No Studies Show That Firearm Waiting Period Laws Have
          Any Affect As To the Overall Number of Suicides – Nor
          In Particular as Applied to the Three Classes of Plaintiffs......................6

II.  The District Court's Conclusions as to CCW Permit Holders
     is Supported by Evidence. .............................................13

CONCLUSION .......................................................17

CERTIFICATE OF COMPLIANCE ...................................................19

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Silvester v. Harris*, 41 F.Supp.3d 927, 965-966 (E.D. Cal. 2014)................ 5, 11, 12

**Statutes**

Cal. Pen. Code § 26150, et seq. .................................................................13

Cal. Pen. Code § 26220.............................................................................13

Cal. Pen. Code § 26815(a) .....................................................................3, 18

Cal. Pen. Code § 27540(a) .....................................................................3, 18

**Other Authorities**

Conner & Zhong, *State firearm laws and rates of suicide in men and women*,
    25(4) Am. J. of Preventive Med., 320-324 (2003),
    http://www.ajpmonline.org/article/S0749-3797(03)00212-5/fulltext..................11

Crime Prevention Research Center, *Concealed Carry Permit Holders
    Across the United States* (2014), http://crimepreventionresearchcenter.org/wp-
    content/uploads/2014/07/Concealed-Carry-Permit-Holders-Across-the-United-
    States.pdf ............................................................................................14

Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report,
    *Crime in the United States 2013*, Table 1 (Nov. 2014), http://www.fbi.gov/about-
    us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-
    2013/tables/1tabledatadecoverviewpdf/table_1_crime_in_the_united_states_by_
    volume_and_rate_per_100000_inhabitants_1994-2013.xls ...............................14

Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report,
    *Crime in the United States, 2006*, Table 1 (Sept. 2007),
    https://www2.fbi.gov/ucr/cius2006/data/table_01.html .......................................15

//

Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report,
*Crime in the United States, 2006*, Table 74 (Sept. 2007),
https://www2.fbi.gov/ucr/cius2006/data/table_74.html ............................... 15, 16

Florida Dept. of Agriculture and Consumer Services Div. of Licensing,
*Concealed Weapon or Firearm License Summary Report, October 1, 1987 - April 30, 2015*,
http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf ...................................................................................................................16

Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28(2, Supp. 1) Am. J. Prev. Med. 50 (2005) .....................8

Lewiecki & Miller, *Suicide, Guns, and Public Policy*,
103 Am. J. of Pub. Health 27 (2013).......................................................... 10, 12

Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26(1) J. of Leg. Stud. 1 (1997) ...............................................................5

Lott & Whitley, *Safe-Storage Gun Laws*, 44 J.L. & Econ., 659-689 (2001) ...........4

Lott, *Guns and the New York Times: Why shouldn't Americans be able to defend themselves?* Fox News (February 24, 2015),
http://www.foxnews.com/opinion/2015/02/24/guns-and-new-york-times-why-shouldnt-americans-be-able-to-defend-themselves.html .....................................14

Lott, *Impact of the Brady Act on Homicide and Suicide Rates*,
284 J. Am. Med. Ass'n 2718 (2000) .....................................................................7

Lott, *More Guns, Less Crime*, 93, 110 (3d ed. 2010) .........................................5, 16

Ludwig & Cook, *Homicide and Suicide Rates Associated With Implementation of the Brady Handgun Violence Prevention Act*,
284 J. Am. Med. Ass'n 585 (2000).....................................................................6, 7

Ludwig & Cook, *Reply,* 284 J. Am. Med. Ass'n 2720 (2000)..................................7

Moody & Marvell, *On the Choice of Variables in the Crime Equation*,
72 Oxford Bullet. of Econ. and Stat, 696-715 (2010) ............................................4

National Research Council, *Firearms and Violence: A Critical Review* (2005).......5

Regulatory Services Division, Texas Department of Public Safety,
  *Conviction Rates for Concealed Handgun License Holders Reporting Period:
  01/01/2012 - 12/31/2012*, Box 4087 MSC 0245- Austin, Texas 78773-0245,
  https://www.dps.texas.gov/RSD/CHL/Reports/ConvictionRatesReport2012.pdf
  ................................................................................................................16

Stinson, et al., *Exit Strategy: An Exploration of Late-Stage Police Crime*,
  13 Police Quarterly, 415-435 (2010)............................................................ 15, 16

Vars, *Self-Defense Against Gun Suicide*, Forthcoming to Boston College Law
  Review, at p. 12 (as of 2015) (as modified, and currently available at
  http://ssrn.com/abstract=2500291) ...................................................................8, 9

Volokh, *Implementing the Right to Keep and Bear Arms For Self-Defense:
  An Analytical Framework And A Research Agenda*,
  56 UCLA L.Rev. 1443 (2009)...........................................................................11

Wellford, et al., *Firearms and Violence: A Critical Review* 183 (2004)...................9

### INTEREST OF AMICUS CURIAE

The Crime Prevention Research Center (CPRC) is a research and education organization dedicated to conducting academic-quality research on the relationship between laws regulating the ownership or use of guns, crime, and public safety, educating the public on the results of such research, and supporting other organizations, projects, and initiatives that are organized and operated for similar purposes. CPRC's primary goals are to: (1) advance the scientific understanding of the relationship between laws regulating the ownership or use of guns, crime, and public safety; (2) improve the awareness and knowledge of this scientific understanding among the public, journalists, and policy makers; and (3) enhance public safety through these scientific advances and improved awareness and knowledge. The CPRC's Academic Board of Advisors includes top academics from Harvard, University of Chicago, Wharton Business School at the University of Pennsylvania, and Emory University.

### CONSENT TO FILE AND STATEMENT PURSUANT TO RULE 29(C)

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *Amicus* CPRC obtained consent to file from all parties to file this brief pursuant to agreement reached and memorialized on March 27, 2015. As required by Rule 29(c), no party, party's counsel or other person, other than CPRC, its members, or

its counsel, authored this brief, nor contributed money intended to fund the preparation and submission of this brief.

### INTRODUCTION AND SUMMARY OF ARGUMENT

Appellant claims that "the cooling off effect in reducing homicides and suicides is partly based on common sense." (App. Op. Brief, p. 13.) Yet if common sense is the prevailing standard, then the matter is simply decided, for none of the policy-based rationale for the delaying of firearms as to *already-existing gun owners* has any practical application or supposedly beneficial effect.

Under either intermediate or strict scrutiny standards, it was incumbent upon Appellant to provide evidence that the regulations at issue that restrict people's Second Amendment rights increase public safety. Appellant has failed to meet that burden. And neither Appellant nor its supporting *amici* have provided any evidence – either in the record or elsewhere – that waiting periods or background checks reduce violent crime or suicides. Indeed, none of the briefs supporting reversal mention any single study that supports the claim that a 10-day waiting period produces such policy benefits for those who already lawfully possess a firearm as confirmed in the Automated Firearms System, possess a valid Carry Concealed Weapon (CCW) license, or who possess a valid Certificate of Eligibility (COE).

Moreover, contrary to the suggestion of Appellant, the data available as to CCW permit holders demonstrate that the group is extremely law-abiding. This strongly suggests a waiting period or an additional background check would not produce any benefits for public safety.

For these reasons, and as set forth in the Answering Brief of Plaintiffs-Appellees, *Amicus Curiae* CPRC ("Amicus") respectfully submits that the district court's judgment should be affirmed.

**ARGUMENT OF AMICUS CURIAE**

**I.     NO EVIDENCE EXISTS IN THE RECORD OR ELSEWHERE THAT A "COOLING OFF PERIOD" HAS ANY BENEFICIAL EFFECTS AS APPLIED TO THE THREE CLASSES OF PLAINTIFFS SUBJECT TO THE DISTRICT COURT JUDGMENT.**

**A.     THE STUDIES SHOW NO BENEFICIAL EFFECT ON CRIME.**

In essence, Appellant and its supporting *amici* curiae assert two large but interrelated rationales for the firearms purchase waiting period imposed by Pen. Code §§ 26815(a) and 27540(a), arguing that additional time to perform background checks both reduce violent crime and that waiting periods produce a "cooling off" effect for these crimes. But neither Appellant nor its supporting

3

*amici* cite any refereed academic publications to support these claims.[1] Indeed, none of the studies cited directly implicate the class of already-existing gun owners in general.

First, no academic papers cited show that either the waiting period, as applied to already-existing gun owners – generally, the three classes of plaintiffs subject to the district court's judgment – would operate to reduce violent crime. Moreover, Appellant and its supporting *amici* fail to recognize that the theory of waiting periods is not as simple as claimed. Even if there were to be a "cooling off effect," as claimed, to deter crimes of passion (a colorful proposition for which there is no empirical evidence), Appellant and its supporting *amici* ignore that waiting periods also clearly prevent people who are being threatened from quickly obtaining a gun for self defense. If both effects likely occur, the question is which effect is greater. This is an empirical question, and the research generally finds no significant evidence of the impact of waiting periods on crime. Lott & Whitley, *Safe-Storage Gun Laws*, 44 J.L. & Econ., 659-689 (2001); see also, Moody & Marvell, *On the Choice of Variables in the Crime Equation*, 72 Oxford Bullet. of Econ. and Stat, 696-715 (2010); National Research Council, *Firearms and*

---

[1]The amicus brief of the Brady Center to Prevent Gun Violence, at p. 2, fn. 1, cites a seven-page report put together by the Law Center to Prevent Gun Violence entitled: *The California Model: Twenty Years of Putting Safety First* (2013). However, that report makes no attempt to directly link the timing of when California or the rest of the United States passed different gun laws and changes in crime rates, nor are any additional factors accounted for.

*Violence: A Critical Review* (2005).

Moreover, there is some evidence that waiting periods might slightly *increase* violent crime, showing that waiting periods in the Brady Act were associated with a little less than a 4 percent increase in rape and aggravated assault rates. Lott, *More Guns, Less Crime*, 93, 110 (3d ed. 2010); see also, Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26(1) J. of Leg. Stud. 1, 58 (1997) (citing other evidence that waiting periods might actually increase crime rates.)

But more to the point, the question before this Court is not whether background checks or waiting periods generally produce benefits. The issue in this case is a different one: whether a 10-day waiting period produces benefits as applied to those who already lawfully possess a firearm as confirmed in the Automated Firearms System, possess a valid CCW permit, or who possess a valid Certificate of Eligibility. Neither Appellant's brief, nor any of the briefs submitted by its supporting *amici*, provide *any* evidence on this point. And therefore, the district court correctly concluded that "[t]here is no evidence that a 'cooling off period,' such as that provided by the 10-day waiting period, prevents impulsive acts of violence by individuals who already possess a firearm." *Silvester v. Harris*, 41 F.Supp.3d 927, 965-966 (E.D. Cal. 2014). See also, Hahn, et al., discussed *infra* at 11 ("Evidence of the [Brady] law's effects on aggravated assault, robbery,

5

rape, and unintentional firearm-related injury death were inconsistent in direction, with six of the effect estimates indicating an increase, five indicating a decrease, and none being statistically significant.") (EOR280).

Since there appears to be no evidence that background checks reduce crime, Amicus herein is skeptical that there would exist a benefit to requiring those people who have already passed the background check the first time to go through it a second time. In sum, since the individuals in the case being considered by the court already own firearms, we must ask where could the benefit be from a "cooling off" period for them purchasing an additional gun?

### B. NO STUDIES SHOW THAT FIREARM WAITING PERIOD LAWS HAVE ANY AFFECT AS TO THE OVERALL NUMBER OF SUICIDES – NOR IN PARTICULAR AS APPLIED TO THE THREE CLASSES OF PLAINTIFFS.

Appellant claims that it is "well-established that waiting-period laws correlate with reductions in suicides by elderly people." (App. Brief at p. 13.) In support of this claim, Appellant, and supporting *amicus* Everytown for Gun Safety ("Everytown"), cite one study, authored by Jens Ludwig and Philip Cook, to conclude that waiting period laws correlate with reductions in firearm suicides among older Americans. Ludwig & Cook, *Homicide and Suicide Rates Associated With Implementation of the Brady Handgun Violence Prevention Act*, 284 J. Am. Med. Ass'n 585 (2000) ("Ludwig & Cook Study") (EOR at 254-256.) However,

6

both Appellant and Everytown disregard the debate that followed that paper; in particular, they disregard re-estimation of that data and model which show that firearm suicides actually *rose* for those ages 45 to 54, and also for those over age 85. See, Lott, *Impact of the Brady Act on Homicide and Suicide Rates*, 284 J. Am. Med. Ass'n 2718 (2000). Ludwig and Cook, in fact, do not dispute this pattern of firearm suicides by age. Ludwig & Cook, *Reply,* 284 J. Am. Med. Ass'n 2720-2721 (2000).

Nobody who engaged in this debate ever offered any theory to explain why the Brady Handgun Violence Prevention Act, which contained a waiting period, should have lowered firearm suicide rates for those between 55 and 64, but raise it for the other groups. The key point here is that overall, there was no change in the number of suicides, and no correlative effect can therefore be inferred.

And moreover, the original Ludwig & Cook Study found no evidence that the Brady law – and in particular, the waiting period – lowered homicide rates.

Aside from the Ludwig & Cook Study, Appellant cites several other sources, including a study by Hahn, et al. to support Appellant's claim that it is "well-established" that waiting period laws correlate with reductions in suicides by elderly people. (App. Op. Brief at p. 13.) Yet the Hahn study cited further shows that the matter is inconclusive. Their study concludes:

//

> According to the *Community Guide* criteria, the evidence is insufficient to determine the effectiveness of waiting periods for the prevention of suicide, homicide, aggravated assault, robbery, rape, and unintentional firearm-related injury death, because of the small number of available studies, limitations in the design and execution of available studies, and effects that are inconsistent in direction or fail to reach statistical significance.

Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28(2, Supp. 1) Am. J. Prev. Med. 50, 52 (2005) (EOR at 280).

Similarly, Appellant cites a forthcoming law review by Frederick Vars in support of waiting periods, but they mistake what Vars actually concluded. Vars claims that it is "[v]ery likely" that a restriction on immediate purchase of a firearm would result in a "small but significant fraction" of gun suicides committed within days to weeks after the purchase of a handgun.[2] Vars, *Self-Defense Against Gun Suicide*, Forthcoming to Boston College Law Review, at p. 12 (as of 2015) (as modified, and currently available at http://ssrn.com/abstract=2500291). But Professor Vars concludes only that "[a]ctual waiting periods, in contrast, impose

---

[2] It should be noted that Professor Vars is advocating a voluntary system, called "Precommitment Against Suicide," or PAS, by which people at risk of suicide would voluntarily place themselves on a list that would delay a future purchase of a firearm. Professor Vars submits: "Like the do-not-call list, PAS is limited to volunteers, which ensures that it is no broader than necessary." Vars, *Self-Defense Against Gun Suicide*, at 5. Thus, his conclusions about the efficacy of waiting periods upon suicides should be viewed in this context alone, and any attempt to extrapolate his conclusions as to this case, or as to waiting periods in general, would be misleading.

only a delay." Id., at 15. Therefore, he is not claiming that waiting periods reduce suicides, as Appellant suggests, but merely that they *delay* suicides.

And moreover, Vars does not provide any new empirical evidence himself. Instead, he is relying upon the National Research Council study, and he misstates what those authors found. While the Council did say that possibly 3 to 5 percent of suicides occurred after the purchase of a gun, they definitely did not say that "a restriction limited to immediate purchase [may] have a significant effect" as claimed. Vars, *Self-Defense Against Gun Suicide*, *supra*, at 12. Rather, the Council had strongly emphasized that there were many ways to commit suicide and that the evidence did not indicate that gun control laws reduced total suicides. In particular, the authors of the National Research Council work stated:

> The most important limitation is that *these studies do not indicate whether handgun purchasers would have substituted other methods of suicide if a gun were not available*, and do not measure other factors, such as history of substance abuse, psychiatric illness, criminal activity, or domestic violence, which might explain or modify a link between gun ownership and propensity for suicide.

Wellford, et al., *Firearms and Violence: A Critical Review* 183 (2004) (emphasis added.) In examining whether gun laws may reduce the overall incidence of suicides, the authors thus concluded: "Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population." Id., at 192.

Appellant cites other sources to support both statements and the notion of impulsive actions (EOR 251, 252, 263 and 254-256), but these sources focus only on suicides committed with firearms, and ignore the National Research Council study's concerns about substitute methods of committing suicide. None of these studies provide any evidence that total suicides decline as a result of any type of gun control law. And another study cited does not survey any studies that examine waiting periods or background checks, let alone those laws for people who already legally own guns. (EOR 251, 252).

Only the Lewiecki and Miller study (EOR 251) references a study dealing with overall suicide rates and waiting periods, but even then the reference is misleading. Lewiecki & Miller, *Suicide, Guns, and Public Policy*, 103 Am. J. of Pub. Health 27, 29 (2013). They specifically cite a study that contains U.S. data (EOR 253), but the paper itself doesn't specifically test the impact of waiting periods. Instead, the study lumps together waiting periods along with ten other different types of gun control laws and uses an arbitrary weighting of those different laws to separate states into three arbitrary and unequal sets of states based on how restrictive a state's gun laws are. Unlike most studies that separately account for different laws, there is no way to distinguish the impact of any of the 11 different types of laws examined and the paper doesn't show that the existence of a waiting period alters the classification of even one of the states into one of the

10

three categories of restrictive gun laws. Conner & Zhong, *State firearm laws and rates of suicide in men and women*, 25(4) Am. J. of Preventive Med., 320-324 (2003), http://www.ajpmonline.org/article/S0749-3797(03)00212-5/fulltext. The bottom line is that this evidence still doesn't deal with total suicides and only has the most indirect link to the impact of waiting periods.

In the present case, the district court considered all of the publications offered by Appellant at trial. *Silvester*, *supra*, 41 F.Supp.3d at 938. And it correctly concluded, as do we, that the "[s]tudies regarding suicide rates and waiting period laws conducted prior to 2005 are generally considered inconclusive." Id., at 955 (citing Volokh, *Implementing the Right to Keep and Bear Arms For Self-Defense: An Analytical Framework And A Research Agenda*, 56 UCLA L.Rev. 1443, 1538 (2009)).

Moreover, although this discussion is interesting, it is academic at best, for again, none of the studies cited – either in the record or elsewhere – measured the effect of a waiting period upon already-existing firearm owners as to the delay in *subsequent purchases of firearms*, which is the real point at issue. Indeed, all of the studies referenced, in the briefs and elsewhere, seem merely to presume that the effect of delays on firearm purchases would apply only to those who do not already have legal ownership of firearms. And therefore, the district court in this case was absolutely correct in concluding that "[n]one of the submitted social science

studies/excerpts advocate for a 10-day waiting period, or attempt to defend a 10-day waiting period as being supported by clinical or empirical evidence. The studies that are supportive of waiting periods are supportive in theory and seem to assume that the individual does not already possess a firearm." *Silvester*, *supra*, 41 F.Supp.3d at 966.[3]

In sum, there is no empirical evidence to support Appellant's position, and those stated by supporting *amici*, that the so-called "cooling-off effect" has any actual effect in delaying, deferring, or otherwise preventing suicides among people who already own firearms. As Appellant bases its point, in part, upon an appeal to "common sense" (App. Op. Brief at p. 13), it is just as sensible to conclude that those contemplating the use of a firearm to commit suicide would not ordinarily consider the impulsive act of purchasing *another* firearm to do so. If indeed, "[r]educing the availability of lethal instruments during [a transient] period may prevent suicide[,]" (App. Op. Brief at p. 48), then by definition, no waiting period law affecting *subsequent purchases* would operate to reduce the availability of a "lethal instrument" already at hand.

//

//

---

[3] Indeed, the study which the district court referenced in support of this observation stated, "For a suicidal person *who does not already own a handgun*, a delay in the purchase of one allows time for suicidal impulses to pass or diminish." Lewiecki & Miller, *supra*, at 29 (Defense Exhibit DG, EOR 253) (emphasis added.)

## II. THE DISTRICT COURT'S CONCLUSIONS AS TO CCW PERMIT HOLDERS IS SUPPORTED BY EVIDENCE.

The district court's judgment applies to all three classes as requested, and we believe that the judgment was correct as to all three. The second as-applied class of persons consists of those holders of California permits to carry concealed weapon (CCW), under the statutory scheme set forth in Cal. Pen. Code § 26150, et seq. Appellant argues against the district court's findings that CCW-holders in California are law-abiding, safe, and unlikely to engage in impulsive acts or straw purchases. Instead, Appellant argues that "[t]here is no evidentiary basis for finding that CCW permit holders are unlikely to be violently impulsive, or are likely to be deliberative and reflective about firearm use, or are unlikely to engage in straw purchases. (App. Op. Brief at p. 58.) In so arguing, Appellant implies that CCW permit holders are no more or no less likely to engage in such acts, and notwithstanding the rigors of a background check, lack of criminal record, training, and demonstrated, continuous use of a CCW permit,[4] they are just as susceptible to committing crimes of passion or engaging in straw purchases.

In fact, Appellant's suggestion is simply wrong. Unlike the statistical studies regarding cooling-off effects, as stated above, there is extensive evidence on this aspect before this Court: On the whole, concealed handgun permit holders

---

[4] In California, as in many other states, a CCW holder must renew his or her application every two years. Pen. Code § 26220.

are extremely law-abiding. All the peer-reviewed academic research supports this

conclusion.[5] This simply suggests that an additional waiting period would not

produce any benefits.

---

[5] The one non-academic organization that claims that permit holders are dangerous is the Violence Policy Center (VPC), which claims there were 722 gun deaths nationwide from May 2007 to February 2015 that were not self-defense. Of these, supposedly 277 suicides or murders were committed in Michigan. But there are multiple errors. The Michigan State Police numbers just record whether someone committed suicide, not whether they committed suicide with a gun or whether they committed it outside of home where relatively few suicides occur and a permit might have made a difference. Interestingly, the 2013 suicide rate among Michigan permit holders (6.2 per 100,000 permit holders) is lower than the rate among the general adult population (16.59).

The VPC's murder and manslaughter statistics are just as problematic, with the numbers triple or quadruple counted and often legitimate self-defense uses of guns counted as bad events. See, Lott, *Guns and the New York Times: Why shouldn't Americans be able to defend themselves?* Fox News (February 24, 2015), http://www.foxnews.com/opinion/2015/02/24/guns-and-new-york-times-why-shouldnt-americans-be-able-to-defend-themselves.html.

Finally, even if the numbers provided by the VPC were somehow correct, total deaths per year would be about 93. For murders it would be about 53. With an average of about 7.85 million permit holders per year over this period, which implies a total death rate of 1.18 per 100,000 and 0.68 murders per 100,000. By comparison, the U.S. suicide rate in 2013 was 13.02 per 100,000 people and the murder rate was 4.5 per 100,000. Even with these wildly flawed numbers, these rates are much lower than the general population. WISQARS, Centers for Disease Control and Prevention, *Fatal Injury Reports, 1999-2013,* http://webappa.cdc.gov/sasweb/ncipc/dataRestriction_inj.html. Crime Prevention Research Center, *Concealed Carry Permit Holders Across the United States* (2014), http://crimepreventionresearchcenter.org/wp-content/uploads/2014/07/Concealed-Carry-Permit-Holders-Across-the-United-States.pdf; Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report, *Crime in the United States 2013*, Table 1 (Nov. 2014), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/1tabledatadecoverviewpdf/table_1_crime_in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1994-2013.xls.

In fact, CCW permit holders are so law-abiding that they compare favorably even to police officers. According to a study in *Police Quarterly*, during the period from January 1, 2005 to December 31, 2007 there was an average of 703 crimes committed by police per year, with 113 involving firearms violations.[6] With about 683,396 full-time law enforcement employees in 2006,[7] that translates into about 102 crimes by police per hundred thousand officers. Of course, this compares very favorably to the U.S. population as a whole over those years, with 3,813 crimes per hundred thousand people – a crime rate that was 37 times higher than that for police.[8]

But concealed carry permit holders are even more law-abiding than that. Between October 1, 1987 and April 30, 2015, Florida revoked 9,793 concealed

---

[6] These numbers are likely an underestimate of crimes committed by police since the study acquired their list of crimes by police from media accounts. Not all police crimes receive media coverage, and the authors of the study may also have missed some media reports. Stinson, et al., *Exit Strategy: An Exploration of Late-Stage Police Crime*, 13 Police Quarterly, 415-435 (2010).

[7] Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report, *Crime in the United States, 2006*, Table 74 (Sept. 2007), https://www2.fbi.gov/ucr/cius2006/data/table_74.html.

[8] Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report, *Crime in the United States, 2006*, Table 1 (Sept. 2007), https://www2.fbi.gov/ucr/cius2006/data/table_01.html.

handgun permits for misdemeanors or felonies.[9] This is an annual rate of 12.5 per 100,000 permit holders – a mere eighth of the rate at which officers commit misdemeanors and felonies. In Texas in 2012, 120 permit holders were convicted of misdemeanors or felonies – a rate of 20.5 per 100,000, still just a fifth of the rate for police.[10]

Firearms violations among police occur at a rate of 6.9 per 100,000 officers.[11] For permit holders in Florida, it is only 0.31 per 100,000.[12]  Most of these violations were for trivial offenses, such as forgetting to carry one's permit.  The data are similar in 24 other states.  Lott, *More Guns, Less Crime*, *supra*, at

---

[9] Florida Dept. of Agriculture and Consumer Services Div. of Licensing, *Concealed Weapon or Firearm License Summary Report, October 1, 1987 - April 30, 2015*, http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf

[10]  Regulatory Services Division, Texas Department of Public Safety, *Conviction Rates for Concealed Handgun License Holders Reporting Period : 01/01/2012 - 12/31/2012*, Box 4087 MSC 0245- Austin, Texas 78773-0245, https://www.dps.texas.gov/RSD/CHL/Reports/ConvictionRatesReport2012.pdf.

[11] This number is obtained by combining the number of firearm violations obtained by Stinson et. al. with the number of active duty full-time law enforcement officers.  Stinson, et al., *supra*, 13 Police Quarterly at 415-435 and Dept. of Justice, Fed. Bureau of Investigation, Uniform Crime Report, *Crime in the United States, 2006*, Table 74, *supra*.

[12] This number is obtained by following these reports as they were released over 38 months from January 2008 to February 2011, when the state of Florida stopped releasing the firearms violation data.  Florida Dept. of Agriculture and Consumer Services Div. of Licensing, *Concealed Weapon or Firearm License Summary Report*, *supra*.

244-252.

Since we are making appeals, in part, to "common sense," as urged by Appellant (App. Op. Brief at p. 13), it is eminently logical to conclude that people who are going to commit crimes don't generally bother going through the process of getting a concealed handgun permit.

In sum, Appellant's suggestion that CCW permit holders are equally as likely to be "violently impulsive," or engage in straw purchases, as other members of the general public, is simply not a supportable fact. To the contrary, CCW permit holders on the whole are extremely law-abiding, responsible gun owners, and the types of neighbors one might wish to have. And notwithstanding the Appellant's unhealthy skepticism of its own citizens, that statistic is a good thing, for if California follows a nationwide trend of liberalization of carry laws, there are very likely to be more California CCW permit holders in the near future. In short, there is no reason, grounded in law or in policy, to make CCW permit holders, in good standing, or any of the subject plaintiff classes for that matter, wait an additional ten days to purchase a subsequent firearm.

## CONCLUSION

Despite assertions that the benefits from waiting periods and background checks are obvious, the complete lack of empirical studies to support those claims is stark. No evidence is offered that either of these laws reduce violent crime, nor

17

that they reduce overall suicide rates. Even more striking, the discussions that Appellant and *amici* use are not relevant to the case before the court.

Evidence provided in this brief shows that for at least concealed handgun permit holders, one of the classes of plaintiffs in this case, are demonstratively law-abiding, and that it is unlikely that waiting periods or background checks for additional gun purchases could lower crime rates.

For these reasons, and as set forth in the brief of Plaintiffs and Appellees, Amicus Curiae respectfully submits that this court should affirm the judgment of the district court, finding that the waiting periods set forth in Pen. Code §§ 26815(a) and 27540(a), as applied to the three classes, is unconstitutional.

Respectfully submitted,

Dated: June 2, 2015           **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**

/s/ *George M. Lee*
George M. Lee
Attorney for Amicus Curiae
CRIME PREVENTION RESEARCH
CENTER

Dated: June 2, 2015           **CRIME PREVENTION RESEARCH CENTER**

/s/ *John R. Lott*
John R. Lott, Jr., Ph.D.
Amicus Curiae

18

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with Fed. Rule of App.

Procedure 32(a)(7)(C).  According to the word count feature of the word-

processing system used to prepare this brief, it contains 4,296 words, exclusive of

those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface

requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).  It

was prepared in a proportionately-spaced typeface using 14-point Times New

Roman font in Microsoft Word.


Dated: June 2, 2015                     **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**


                                        /s/ *George M. Lee*_____
                                        George M. Lee
                                        Attorney for Amicus Curiae
                                        CRIME PREVENTION RESEARCH
                                        CENTER

19

## CERTIFICATE OF SERVICE

(All Case Participants Registered for the Appellate CM/ECF System)


Pursuant to Circuit Rule 25-5(g), I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, on June 2, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.


/s/ *George M. Lee*
George M. Lee
Attorney for Amicus Curiae
CRIME PREVENTION RESEARCH
CENTER

20