**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFF SILVESTER; BRANDON COMBS; THE CALGUNS FOUNDATION, INC., a non-profit organization; THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization, *Plaintiffs-Appellees*, | No. 14-16840 <br><br> D.C. No. 1:11-cv-02137-AWI-SKO |
| v. | OPINION |
| KAMALA D. HARRIS, Attorney General of the State of California, in her official capacity, *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Senior District Judge, Presiding

Argued and Submitted February 9, 2016
San Francisco, California

Filed December 14, 2016

Before: Sidney R. Thomas, Chief Judge, and Mary M.
Schroeder and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Schroeder;
Concurrence by Chief Judge Thomas

## SUMMARY[*]

### Civil Rights / Second Amendment

The panel reversed the district court's bench trial judgment and remanded for entry of judgment in favor of the state of California in an action challenging a California law establishing a 10-day waiting period for all lawful purchases of guns.

The panel first stated that this case was a challenge to the application of the full 10-day waiting period to those purchasers who have previously purchased a firearm or have a permit to carry a concealed weapon, and who clear a background check in less than ten days. The panel held that the ten-day waiting period is a reasonable safety precaution for all purchasers of firearms and need not be suspended once a purchaser has been approved. The panel determined that it need not decide whether the regulation was sufficiently longstanding to be presumed lawful. Applying intermediate scrutiny analysis, the panel held that the law does not violate plaintiff's Second Amendment rights because the ten-day wait is a reasonable precaution for the purchase of a second or third weapon, as well as for a first purchase.

Concurring, Chief Judge Thomas agreed entirely with the majority opinion. He wrote separately because in his view the challenge to California's ten-day waiting period could be resolved at step one of the Second Amendment jurisprudence. Judge Thomas determined that as a longstanding qualification

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

on the commercial sale of arms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), a ten-day waiting period was presumptively lawful. Therefore, it was unnecessary to proceed to the second step intermediate scrutiny examination of the law.

## COUNSEL

Jonathan M. Eisenberg (argued) and Peter H. Chang, Deputy Attorneys General; Mark R. Beckington, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, San Francisco, California; for Defendant-Appellant.

Bradley A. Benbrook (argued) and Stephen M. Duvernay, Benbrook Law Group PC, Sacramento, California; Donald E.J. Kilmer, Jr., Law Offices of Donald Kilmer, San Jose, California; Victor J. Otten, Otten Law PC, Torrance, California; for Plaintiffs-Appellees.

Anna M. Barvir, Clinton B. Monfort, and C.D. Michel, Michel & Associates PC, Long Beach, California, for Amici Curiae California Rifle and Pistol Association and Gun Owners of California.

Jeremiah L. Morgan, John S. Miles, William J. Olson, Robert J. Olson, and Herbert W. Titus, William J. Olson P.C., Vienna, Virginia; for Amici Curiae Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, The Lincoln Institute for Research and Education, The Abraham Lincoln Foundation for Public Policy Research, Inc., Institute

on the Constitution, and Conservative Legal Defense and Education Fund.

Michael Connelly, Ramona, California, as and for Amicus Curiae U.S. Justice Foundation.

George M. Lee, Seiler Epstein Ziegler & Applegate LLP, San Francisco, California; John R. Lott, Jr., Ph.D., Crime Prevention Research Center, Swarthmore, Pennsylvania; for Amicus Curiae Crime Prevention Research Center.

Marienne H. Murch, Rebecca A. Jacobs, and Simon J. Frankel, Covington & Burling LLP, San Francisco, California, for Amicus Curiae The Law Center to Prevent Gun Violence.

Jonathan E. Taylor and Deepak Gupta, Gupta Beck PLLC, Washington, D.C., for Amicus Curiae Everytown for Gun Safety.

David Skaar and Anthony Basich, Hogan Lovells US LLP, Los Angeles, California; Jonathan E. Lowry, Brady Center to Prevent Gun Violence - Legal Action Project, Washington, D.C.; for Amicus Curiae Brady Center to Prevent Gun Violence.

# OPINION

SCHROEDER, Circuit Judge:

## INTRODUCTION

California has extensive laws regulating the sale and purchase of firearms. The State now appeals the district court's judgment in favor of Plaintiffs in their Second Amendment challenge to the State's law establishing a 10-day waiting period for all lawful purchases of guns.

This case is a challenge to the application of the full 10-day waiting period to those purchasers who have previously purchased a firearm or have a permit to carry a concealed weapon, and who clear a background check in less than ten days. It is not a blanket challenge to the waiting period itself. It is not a challenge to the requirement that the California Bureau of Firearms ("BOF") approve of the purchase of any firearm. It is not a claim that persons have been denied firearms who should have been permitted to purchase them. Plaintiffs do not seek instant gratification of their desire to purchase a weapon, but they do seek gratification as soon as they have passed the BOF background check.

The district court agreed with Plaintiffs that having to wait the incremental period between the time of approval of the purchase and receipt of the weapon violated Plaintiffs' Second Amendment rights. The court rejected the State's contention that a 10-day "cooling off" period was a justifiable safety precaution for all purchasers of firearms, regardless of whether they already lawfully possessed a firearm or a permit to carry one. The court also rejected the State's argument that a waiting period, in existence in California in some form for

nearly a century, was the type of long accepted safety regulation considered to be presumptively lawful by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Because we agree with the State that the 10-day waiting period is a reasonable safety precaution for all purchasers of firearms and need not be suspended once a purchaser has been approved, we reverse the district court's judgment. We do not need to decide whether the regulation is sufficiently longstanding to be presumed lawful. Applying intermediate scrutiny analysis, we hold that the law does not violate the Second Amendment rights of these Plaintiffs, because the ten day wait is a reasonable precaution for the purchase of a second or third weapon, as well as for a first purchase.

We begin our Second Amendment analysis with the legal background. It reflects that, beginning with the Supreme Court's watershed decision in *Heller*, federal courts have had to scrutinize a variety of state and local regulations of firearms, and that our court, along with others, has developed a body of law applying intermediate scrutiny to regulations falling within the scope of the Second Amendment's protections.

## LEGAL BACKGROUND

## I.  The Supreme Court's Decision in *Heller*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The seminal case interpreting the Second Amendment in this century is *Heller*,

where the Supreme Court confronted statutes effectively prohibiting operable firearms in the home.  554 U.S. at 628.

In *Heller*, the plaintiff challenged District of Columbia statutes that banned the possession of all handguns, and required that any lawful firearm stored in the home, such as a hunting rifle, be "disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* After conducting a lengthy historical inquiry into the original meaning of the Second Amendment, the Court announced for the first time that the Second Amendment secured an "individual right to keep and bear arms." *Id.* at 595.  The Court determined that the right of self defense in the home is central to the purpose of the Second Amendment, while cautioning that the right preserved by the Second Amendment "is not unlimited." *Id.* at 626–28.

*Heller* gave us the framework for addressing Second Amendment challenges.  First, *Heller* evaluated whether the firearms regulations fell within "the historical understanding of the scope of the [Second Amendment] right." *Id.* at 625. The Court indicated that determining the scope of the Second Amendment's protections requires a textual and historical analysis of the Amendment.  *Id.* at 576–605.

The Court also recognized that the Second Amendment does not preclude certain "longstanding" provisions, *id.* at 626–27, which it termed "presumptively lawful regulatory measures," *id.* at 627 n.26.  The Court provided examples of such presumptively lawful regulations that it said included, but were not limited to, "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and

qualifications on the commercial sale of arms." *Id.* at 626–27.

Guided by its historical inquiry, the Court struck down District of Columbia statutes that banned handgun possession and required all lawful firearms in homes to be unloaded and disassembled or locked. *Id.* at 629–30. The Court rejected the government's position that because the Amendment begins with a reference to the need for a militia, the Second Amendment protects only the right to bear arms for military purposes.

The four dissenting Justices relied on *United States v. Miller*, where the Court made reference to the military and civilian purposes of the Amendment. *Id.* at 637–38 (Stevens, J., dissenting) (citing *Miller*, 307 U.S. 174 (1939)). The Court there upheld a regulation prohibiting the civilian possession of short-barreled shotguns. *Miller*, 307 U.S. at 178. Under the dissent's reading of *Miller*, the Second Amendment "protects the right to keep and bear arms for certain military purposes, but [] it does not curtail the Legislature's power to regulate the non-military use and ownership of weapons." *Heller*, 554 U.S. at 637. The *Heller* majority interpreted *Miller* as limiting the type of weapon eligible for Second Amendment protection, not as restricting the Amendment to military purposes. *Id.* at 622. "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623.

The core of the *Heller* analysis is its conclusion that the Second Amendment protects the right to self defense in the home. The Court said that the home is "where the need for defense of self, family, and property is most acute," and thus,

the Second Amendment must protect private firearms ownership. *Id.* at 628. The *Heller* Court held that, under any level of scrutiny applicable to enumerated constitutional rights, the ban on handgun possession "would fail constitutional muster." *Id.* at 629. Notably, in so doing, the Court expressly left for future evaluation the precise level of scrutiny to be applied to laws relating to Second Amendment rights. *Id*. at 626–27, 634–35. The Court did, however, reject a rational basis standard of review, thus signaling that courts must at least apply intermediate scrutiny. *Id.* at 628 n.27.

We therefore turn to our circuit law that has developed during the eight years since *Heller*.

## II. Ninth Circuit Law Since *Heller*

### A. The two-step inquiry for Second Amendment cases

Our court, along with the majority of our sister circuits, has adopted a two-step inquiry in deciding Second Amendment cases: first, the court asks whether the challenged law burdens conduct protected by the Second Amendment; and if so, the court must then apply the appropriate level of scrutiny. Our two leading cases in this circuit are *Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), and *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). In *Chovan*, we collected cases from other circuits utilizing a similar two-step inquiry. 735 F.3d at 1134–37.

The analysis flows from *Heller*'s identification of the Amendment's core purpose of self defense in the home and *Heller*'s charge to the lower courts to evaluate the appropriate level of review, as well as the scope of the Amendment's

protections. We stressed in *Chovan* that the Supreme Court did not define the scope of the Second Amendment protection, but it "did establish that the individual right guaranteed by the Amendment is 'not unlimited.'" *Id.* at 1133 (quoting *Heller*, 554 U.S. at 626).

Under our case law, the court in the first step asks if the challenged law burdens conduct protected by the Second Amendment, based on a "historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. Whether the challenged law falls outside the scope of the Amendment involves examining whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood. *Id.* Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis. *See Peruta v. Cty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc). A challenged law may also fall within the limited category of "presumptively lawful regulatory measures" identified in *Heller*. *Jackson*, 746 F.3d at 960; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996–97 (9th Cir. 2015).

If the regulation is subject to Second Amendment protection (*i.e.*, the regulation is neither outside the historical scope of the Second Amendment, nor presumptively lawful), the court then proceeds to the second step of the inquiry to determine the appropriate level of scrutiny to apply. *Jackson*, 746 F.3d at 960. In ascertaining the proper level of scrutiny, the court must consider: (1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right. *Id.* at 960–61.

The result is a sliding scale. A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. *Id.* at 961. That is what was involved in *Heller*. 554 U.S. at 628–29. A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. *See Chovan*, 735 F.3d at 1138. Otherwise, intermediate scrutiny is appropriate. "[I]f a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right," the court may apply intermediate scrutiny. *Jackson*, 746 F.3d at 961.

We have imported the test for intermediate scrutiny from First Amendment cases. *See id.* at 965; *Chovan*, 735 F.3d 1138–39. To uphold a regulation under intermediate scrutiny, we have identified two requirements: (1) the government's stated objective must be significant, substantial, or important; and (2) there must be a "reasonable fit" between the challenged regulation and the asserted objective. *Chovan*, 735 F.3d at 1139.

**B. Cases applying intermediate scrutiny**

This court has applied intermediate scrutiny in a series of cases since *Heller* to uphold various firearms regulations. *See Fyock*, 779 F.3d at 1000–01; *Jackson*, 746 F.3d at 966, 970; *Chovan*, 735 F.3d at 1139. The first was *Chovan* where we considered a regulation prohibiting domestic violence misdemeanants from possessing firearms. We held that the law did not violate the Second Amendment because the prohibition was substantially related to the important

government interest of preventing domestic gun violence. 735 F.3d at 1141.

Then in *Jackson*, we affirmed the district court's denial of a preliminary injunction in which plaintiffs sought to enjoin a San Francisco ordinance requiring handguns inside the home to be stored in locked containers or disabled with a trigger lock when not being carried on the person. 746 F.3d at 958. We held that this was appropriately tailored to fit the city's interest of reducing the risk of firearm injury and death in the home, and thus, survived intermediate scrutiny. *Id.* at 966. We concluded that the regulation did not prevent citizens from using firearms to defend themselves in the home, but rather indirectly burdened handgun use by requiring an individual to retrieve a weapon from a locked safe or removing a trigger lock. *Id.* We distinguished that regulation from the total ban in *Heller* because it only burdened the "manner in which persons may exercise their Second Amendment rights." *Id.* at 964 (quoting *Chovan*, 735 F.3d at 1138).

*Jackson* also involved a challenge to a law prohibiting the sale of hollow-point ammunition. *Id.* at 967. We applied intermediate scrutiny and found that the regulation was a reasonable fit with the objective of reducing the "lethality" of bullets because it targeted only the sale of a class of bullets that exacerbates the harmful effect of gun-related injuries. *Id.* at 970.

In *Fyock*, we affirmed the district court's denial of a preliminary injunction to enjoin a city ordinance restricting possession of large-capacity magazines. 779 F.3d at 994. We denied the injunction on the ground that the challenge to the regulation was not likely to succeed on the merits. We

concluded that the ordinance would likely survive intermediate scrutiny because the city presented sufficient evidence to show that the ordinance was substantially related to the compelling government interest of public safety. *Id.* at 1000–01.

While these cases all upheld regulations within the scope of the Amendment because they did not severely burden the exercise of rights, this court, very recently, sitting en banc, looked to whether a regulation was outside the scope of the Second Amendment. In *Peruta*, we considered California's statutory scheme regulating conceal carry permits. 824 F.3d at 924. We held that the Second Amendment does not protect the right to carry a concealed weapon in public. *Id.* at 939. Applying an exhaustive historical analysis, we concluded that the carrying of concealed weapons outside the home had never been acceptable and was therefore beyond the scope of the Second Amendment's protections. *Id.* We stressed that *Heller* put limits on the scope of the Amendment and had expressly observed that the Second Amendment has not generally been understood to protect the right to carry concealed weapons. *Id.* at 928 (citing *Heller*, 554 U.S. at 626–27).

A concurrence by three judges agreed, but additionally came to an alternative conclusion that if the regulation was within the scope of the Second Amendment, the regulation would survive intermediate scrutiny. *Id.* at 942 (Graber, J., concurring). (The majority agreed with this analysis, though found it unnecessary to reach the issue. *Id.*)

Our intermediate scrutiny analysis is in line with that of other circuits. They have applied similar intermediate scrutiny to uphold firearms regulations within the scope of

the Second Amendment. *See Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) (holding that a regulation requiring individuals seeking a permit to carry a handgun in public was longstanding and presumptively lawful, and that it withstands intermediate scrutiny); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (applying intermediate scrutiny, upholding a Maryland statute that required an applicant for a permit to carry a handgun outside the home to provide a substantial reason for doing so); *NRA v. McCraw*, 719 F.3d 338 (5th Cir. 2013) (upholding, under intermediate scrutiny, Texas's statutory scheme barring 18-to-20-year-olds from carrying handguns in public); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (applying intermediate scrutiny in upholding New York legislation that prevented individuals from obtaining a concealed carry license, except individuals who demonstrated a special need for self protection); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (finding a prohibition on assault weapons passed muster under intermediate scrutiny review); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (applying intermediate scrutiny to uphold a statute prohibiting drug users from firearm possession).

There is accordingly near unanimity in the post-*Heller* case law that when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate. Most circuits also appear to apply a two-step test similar to ours. The case law in our circuit and our sister circuits thus clearly favors the application of intermediate scrutiny in evaluating the constitutionality of firearms regulations, so long as the regulation burdens to some extent conduct protected by the Second Amendment. Critical to that analysis is identifying an important legislative objective and determining whether the regulation reasonably fits with the

objective.  We therefore turn to the history and operation of the California law at issue in this case.

## BACKGROUND OF THIS LITIGATION

### I.  History and Purpose of California's Waiting Period Laws

California has had some kind of waiting period statute for firearm purchases continuously since 1923.  As the various statutory provisions evolved, the purposes of the waiting period have become clearer: to allow sufficient time for law enforcement to complete a background check, and also to provide a "cooling off" period (*i.e.*, a period in which weapons purchasers may reconsider, particularly when an impulsive act of violence or self harm may be contemplated).  In adopting the most recent provision, enacted in 1996, the Legislature expressly identified its concern with the impulsive use of handguns as a threat to public safety.

California's first waiting period law ("WPL") barred delivery of a pistol, revolver, or concealable firearm on the day of purchase.  This 1923 law also prohibited felons from owning or possessing a firearm and imposed a corresponding restriction on selling guns to such persons.  Law of June 13, 1923, ch. 339 §§ 2, 10, 1923 Cal. Laws 695, 696.  The 1923 law also created a weapon recording system, the Dealer Record of Sale ("DROS").  The law required dealers to obtain identifying information about purchasers and mail a form on the day of the sale to the local police or county clerk to be recorded.  The system continues to this day but in electronic form.

In 1955, the California Legislature extended the waiting period to three days, and in 1965, to five days. The legislative history indicates that the latter change was made to allow sufficient time for the California Department of Justice ("DOJ") and law enforcement to complete a background check. The 3-day waiting period was not enough to run an adequate background check. "Five days [was therefore] suggested as a more useful waiting period." Letter from Anthony C. Beilenson, Member, California Assembly, to Edmund G. Brown, Governor, California (June 30, 1965); *see* Letter from Charles A. Barrett, Assistant Attorney General, to Edmund G. Brown, Governor, California (June 24, 1965). In 1975, the California Legislature extended the waiting period to fifteen days. The legislative history indicates that the purpose of this extension was to allow more time for more extensive background checks. Cal. S. Comm. on the Judiciary, Assemb. B. 1441, 1975–76 Reg. Sess. (Cal. 1975).

As the length of the waiting period expanded to permit more extensive background checks, the applicability of the law expanded as well. Before 1991, the WPLs applied only to small arms. In 1991, California expanded the waiting period to cover all firearms.

In 1996, the California BOF switched to an electronic database system, which allowed for faster processing of background checks. This resulted in the reduction of the waiting period from fifteen days to the current ten days; the change was accompanied by a legislative explanation of the reasons for WPLs with special reference to handguns. The 1996 legislative history spelled out two justifications for WPLs: "One is the need to allow time for the [California] Department of Justice to do background checks. Another is

the desire to provide a 'cooling off' period, especially for handgun sales." Cal. S. Comm. on Crim. Pro., 17 S. B. 671, 1995–96 Reg. Sess. 2099-0051 (Cal. 1995). The legislature thus intended to prevent immediate access in order to reduce impulsive purchases of handguns for violent ends. This is understandable, since human nature is such that an individual may not act on violent impulses if provided with a period of time to calm down.

The law has remained the same since 1996. Its history demonstrates that the California Legislature has, since 1923, required potential purchasers to wait for some period of time before taking possession of a firearm. The amount of time a purchaser has had to wait has fluctuated, mainly because of the nature of the background check process, but the legislative purpose has always been to allow enough time for background checks. The Legislature made clear in 1996, that it was additionally concerned about the impulsive use of handguns. It thus emphasized that a waiting period also serves as a cooling-off period.

The essence of Plaintiffs' claim is that they are entitled to possession of guns they purchase as soon as the background check is completed. It is therefore important to understand how the California background check system operates. We turn to that subject.

## II. The California Background Check System

Citizens who want to purchase a firearm (and do not fall into one of the law's eighteen exemptions, including law enforcement) must pass a background check to show that they do not fall into one of the prohibited classes. The background check begins with the completion and submission of an

application form that the gun dealer electronically submits to the California DOJ. The form contains information about the prospective purchaser, the firearm, and the dealership.

The California DOJ maintains the Consolidated Firearms Information System ("CFIS"), an automated system that performs the electronic part of the background check process, called the Basic Firearms Eligibility Check ("BFEC"): It processes the application by sending inquiries to other electronic databases. The BFEC first queries California's Department of Motor Vehicles ("DMV") database, to ensure the purchaser's identifying information is valid. Next, the BFEC checks the Automated Firearms System ("AFS") database to determine whether the firearm has been reported lost or stolen. AFS is a leads database, primarily generated through DROS and police reports, used by law enforcement to identify individuals who may possess a firearm.

If the application passes the DMV and AFS checks, an eligibility check begins. Under California law, a person can lawfully purchase only one handgun in a 30-day period. Cal. Penal Code § 27535. CFIS queries its own records to make sure that the purchaser has not purchased another handgun in the prior thirty days. Next, the BFEC checks a series of state and federal criminal and mental-health databases to confirm that the purchaser is not prohibited from purchasing firearms under state or federal law.

If the application generates any "hits" or "matches" in the background check process, it is sorted for manual review by a California DOJ analyst. Approximately 80 percent of applicants require a manual review. The California DOJ has the authority to delay the delivery of a firearm for up to thirty

days in order to complete the background check.  *See id.* at § 28220(f).

If the application passes through each of these steps without a "hit" showing that the purchaser may be prohibited, then the application is automatically approved and the background check is complete.  Approximately 20 percent of applications are automatically approved, and the application process is generally completed in less than ten days for all applicants.

## III.    Proceedings in District Court

In December 2011, Plaintiffs, two individuals, Jeff Silvester and Brandon Combs; and two firearm-rights organizations, the Calguns Foundation, Inc. and the Second Amendment Foundation, Inc., initiated the present lawsuit in federal district court.  Plaintiffs challenged the full 10-day waiting period imposed by California Penal Code §§ 26815 and 27540, as applied to three classes, termed "subsequent purchasers," all of whom likely already possessed a gun.

The first class of subsequent purchasers consisted of individuals with firearms listed in the AFS database.  AFS is not a gun registry.  AFS receives its information from a variety of sources, including DROS records, voluntary reports from people who have obtained a firearm, and law enforcement reports.  The database reflects California DOJ's best available information about who currently owns a firearm.

The second class of subsequent purchasers consisted of individuals who possess a valid license to carry a concealed

weapon ("CCW"). A CCW permit is valid for two years. *Id.* at § 26220(a).

The third class was a subset of the first: it consisted of individuals identified in AFS who also possess a "certificate of eligibility" ("COE"), issued by the California DOJ. Such a certificate confirms a person's eligibility to lawfully possess and/or purchase firearms under state and federal law. *Id.* at § 26710; 11 Cal. Code Regs. § 4031(g). A COE is valid for one year.

The district court held a 3-day trial that principally concerned how the California system works. The operation of the system is not disputed on appeal, although the parties dispute the reliability of the AFS system. Plaintiffs argue that AFS is a reliable source for identifying individuals who possess firearms because law enforcement officers view AFS to be reliable to identify who already possesses a gun. The State contends that AFS cannot be relied upon to identify individuals who own guns because AFS is not a gun registry but rather a leads database used by law enforcement to identify individuals who may possess a gun. We do not regard the dispute to be material because the legal issues can be decided on the assumption that Plaintiffs are justified in relying on the accuracy of the system.

The district court applied intermediate scrutiny since it found that the full 10-day waiting period burdened, to some extent, Second Amendment rights. It also recognized that the State has important interests in thorough background checks to make sure that firearms stay out of the hands of prohibited individuals. The court further noted the State's interest in providing a cooling-off period in order to hinder impulsive acts of violence or self injury using firearms.

The court held, however, that while the State's objectives of public safety and reducing gun violence are legitimate, those interests were not furthered by enforcing a 10-day waiting period for subsequent purchasers who pass the background check in less time.  In other words, the court found that for these Plaintiffs, there was no "reasonable fit" between the waiting period and the safety objective.  The court's theory was that if a subsequent purchaser already owned a gun, then the purchaser could use that gun to commit impulsive acts of violence or self harm.  Thus, the court reasoned that there was no justification to require subsequent purchasers to wait beyond a background check approval before taking possession of a firearm.

The State had contended that the cooling-off period as applied to Plaintiffs is reasonably suited to a safety objective; waiting ten days may deter subsequent purchasers from buying new weapons that would be better suited for a heinous use.  The district court dismissed the State's argument.  The court thereby essentially discounted the dangers inherent in the proliferation of guns, including guns suitable only for use to injure others, such as Saturday night specials or large-capacity guns that have been used in mass shootings.  The district court entered judgment for Plaintiffs.

## IV.    This Appeal

The State appeals.  It contends that the WPLs, as applied to Plaintiffs, must be upheld under all three legal theories our cases have discussed.  First, the State argues that the WPLs fall outside the scope of the Second Amendment because during the founding era, WPLs would have been accepted and understood to be permissible.  The State alternatively argues that the WPLs do not violate the Second Amendment because

they fall within several categories of "presumptively lawful" regulations under *Heller*. Finally, the State contends that the WPLs survive intermediate scrutiny because they reasonably fit with the important government interests of public safety and reducing gun violence. We hold that the State must prevail under the proper application of intermediate scrutiny analysis. We assume, without deciding, that the regulation is within the scope of the Amendment and is not the type of regulation that must be considered presumptively valid.

## ANALYSIS

It may be surprising that there has been no case law since *Heller* discussing the validity of firearm WPLs, and that this is therefore a case of first impression. The issue in this case is narrow, however, because it concerns whether California's 10-day wait to take possession of a firearm violates Second Amendment rights when applied to subsequent purchasers who pass the background check in less than ten days.

We apply intermediate scrutiny when a challenged regulation does not place a substantial burden on Second Amendment rights. *Jackson*, 746 F.3d at 961. The burden of the 10-day waiting period here, requiring an applicant to wait ten days before taking possession of the firearm, is less than the burden imposed by contested regulations in other Ninth Circuit cases applying intermediate scrutiny. *See, e.g.*, *Fyock*, 779 F.3d 991; *Jackson*, 746 F.3d 953; *Chovan*, 735 F.3d 1127. This court has explained that laws which regulate only the "*manner* in which persons may exercise their Second Amendment rights" are less burdensome than those which bar firearm possession completely. *Chovan*, 735 F.3d at 1138.

The actual effect of the WPLs on Plaintiffs is very small. The contested application of the regulation to Plaintiffs simply requires them to wait the incremental portion of the waiting period that extends beyond completion of the background check. The regulation does not prevent, restrict, or place any conditions on how guns are stored or used after a purchaser takes possession. The WPLs do not approach the impact of the regulation in *Jackson* that required firearms to be stored in locked containers or disabled with a trigger lock. 746 F.3d at 963. The waiting period does not prevent any individuals from owning a firearm, as did the regulation in *Chovan*. 735 F.3d at 1139.

There is, moreover, nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business.

It therefore cannot be said that the regulation places a substantial burden on a Second Amendment right. Intermediate scrutiny is appropriate. Accordingly, we proceed to apply the two-step analysis of intermediate scrutiny that looks first to the government's objectives in enacting the regulation and second to whether it is reasonably suited to achieve those objectives. *Jackson*, 746 F.3d at 965.

From the beginning, the waiting period in California has had the objective of promoting safety and reducing gun

violence. The parties agree that these objectives are important. The first step is undisputedly satisfied.

The parties dispute, however, whether the WPLs reasonably fit with the stated objectives. The test is not a strict one. We have said that "intermediate scrutiny does not require the least restrictive means of furthering a given end." *Id*. at 969. Instead, it requires only that the law be "substantially related to the important government interest of reducing firearm-related deaths and injuries." *Id.* at 966. The district court recognized that some waiting period was necessary for background checks, but held that the full waiting period served no further legislative purpose as applied to subsequent purchasers. We cannot agree. In enacting the present statute, the Legislature said that the WPLs "provide a 'cooling-off' period, especially for handgun sales." The legislation coincided historically with increased national concern over the prevalence of inexpensive handguns leading to crime and violence. In fact, the following year, the Legislature introduced the Handgun Safety Standard Act of 1997 in response to the proliferation of cheap handguns, which the California DOJ said, at the time, were "three times more likely to be associated with criminal activity than any other type of weapon." Assemb. B. 488, 1997–98 Reg. Sess. (Cal. 1997).

The State, in the district court, relied on studies showing that a cooling-off period may prevent or reduce impulsive acts of gun violence or self harm. One study confirmed that firearm purchasers face the greatest risk of suicide immediately after purchase, but the risk declines after one week. Another found that WPLs correlate to reductions in suicides among the elderly. The district court discounted these studies, saying that the studies did not focus on

subsequent purchasers.    But the studies related to all purchasers.  They confirm the common sense understanding that urges to commit violent acts or self harm may dissipate after there has been an opportunity to calm down.  This is no less true for a purchaser who already owns a weapon and wants another, than it is for a first time purchaser.

The district court reasoned that a cooling-off period would not have any deterrent effect on crimes committed by subsequent purchasers, because if they wanted to commit an impulsive act of violence, they already had the means to do so.  This assumes that all subsequent purchasers who wish to purchase a weapon for criminal purposes already have an operable weapon suitable to do the job.

The district court's assumption is not warranted.  An individual who already owns a hunting rifle, for example, may want to purchase a larger capacity weapon that will do more damage when fired into a crowd.  A 10-day cooling-off period would serve to discourage such conduct and would impose no serious burden on the core Second Amendment right of defense of the home identified in *Heller*.  554 U.S. at 628.

The thrust of the Plaintiffs' argument on appeal is similar. They contend that once a subsequent purchaser has passed the background check, and it is determined that there is no reason why the purchase should be prohibited, then there is no reason to delay the purchase any further.  They therefore contend that the waiting period is overinclusive and applies to more people than it should.

Their position in this regard is very similar to the argument we rejected in *Jackson*. We there upheld a

regulation requiring handguns to be stored in locked containers or disabled with a trigger lock when not carried on the person. *Jackson*, 764 F.3d at 969. Plaintiffs had argued that because a principal purpose of the law was to prevent access to weapons by children and other unintended users, the law was too broad and should not apply when there was little risk of unauthorized access, as, for example, when the gun owner lived alone. *Id.* at 966.

We upheld the regulation because the safety interests that the government sought to protect were broader than preventing unauthorized access. The interests extended to reducing suicides and deterring domestic violence on the part of authorized users. *Id.* We said, "San Francisco has asserted important interests that are broader than preventing children or unauthorized users from using the firearms, including an interest in preventing firearms from being stolen and in reducing the number of handgun-related suicides and deadly domestic violence incidents." *Id.*

The State's reasons for the WPLs here, like the reasons for the storage protections in *Jackson*, are broader than Plaintiffs are willing to recognize. The waiting period provides time not only for background checks, but for the purchaser to reflect on what he or she is doing, and, perhaps, for second thoughts that might prevent gun violence.

Thus the waiting period, as applied to these Plaintiffs, and the safety storage precautions, as applied to the plaintiffs in *Jackson*, have a similar effect. Their purpose is to promote public safety. Their effect is to require individuals to stop and think before being able to use a firearm.

The State is required to show only that the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Fyock*, 779 F.3d at 1000 (citation and quotation marks omitted). The State has established that there is a reasonable fit between important safety objectives and the application of the WPLs to Plaintiffs in this case. The waiting period provides time not only for a background check, but also for a cooling-off period to deter violence resulting from impulsive purchases of firearms. The State has met its burden.

## CONCLUSION

The judgment of the district court is reversed and the matter is remanded for the entry of judgment in favor of the State.

Costs are awarded to the State.

**REVERSED** and **REMANDED**.

---

THOMAS, Chief Judge, concurring:

I agree entirely with, and concur in, the majority opinion. I write separately, however, because the challenge to California's ten-day waiting period can be resolved at step one of our Second Amendment jurisprudence. As a longstanding qualification on the commercial sale of arms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), a ten-day waiting period is presumptively lawful. Therefore, it is unnecessary to proceed to the second step intermediate scrutiny examination of the law.

*Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), clarified our understanding of the protections and applicability of the Second Amendment, but left examinations of specific regulations to the future, noting that the right to keep and bear arms is "not unlimited." *Heller*, 554 U.S. at 595, 626. As the majority explains, we have adopted a two-step inquiry to analyze Second Amendment challenges under *Heller*. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); Majority Op. 9. At step one, we ask "whether the challenged law burdens conduct protected by the Second Amendment," and if it does, we proceed to step two and "apply an appropriate level of scrutiny." *Id.* "To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the presumptively lawful regulatory measures identified in *Heller* or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson v. City & Cty. of San Francisco*, 746 F.2d 953, 960 (9th Cir. 2014) (citations omitted). If a regulation qualifies as longstanding and presumptively lawful at step one, we need go no further. *Jackson*, 746 F.3d at 960 (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792 (2011)).

As to the step one analysis, *Heller* specifically identified a non-exhaustive list of "longstanding prohibitions," which can be considered "presumptively lawful regulatory measures" falling outside the scope of Second Amendment protection. 554 U.S. at 626, 627 n.26. The examples identified include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. Similarly, the right to keep and bear arms is limited to "the sorts of weapons" that are "in common use." *Id.* at 627–28 (citing *United States v. Miller*, 307 U.S. 174, 179 (1939)).

The category of presumptively lawful regulatory measures at issue here is "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 627. The dictionary definitions of the terms 'conditions' and 'qualifications' largely reflect their common meaning. Webster's first definition of a condition is "[s]omething established or agreed upon as a requisite to the doing or taking effect of something else; a stipulation or provision." Webster's Second New International Dictionary, 556 (1959).[1] As relevant here, a qualification is "[a] condition precedent that must be complied with for the attainment of a status, the perfection of a right, etc., or for admission to an office . . . ." *Id.* at 2031.[2]

---

[1] The ninth listed definition pertains specifically to legal contexts and defines a condition as "[a] provision in a contract, conveyance, grant, or will, providing that the beginning, vesting, rescission, or a modification, of an estate or interest in property or of a personal obligation shall depend upon an uncertain event, which may or may not exist or happen; also, the event itself." Webster's Second New International Dictionary, 556 (1959).

[2] For reference, the first two definitions of qualification are reproduced here in their entirety: "1. Act or an instance of qualifying, or a state or process of being qualified. 2. a That which qualifies; any natural endowment, or any acquirement, which fits a person for a place, office, or employment, or to sustain any character; requisite capacity or possession; also, a requisite or essential of a thing. b A condition precedent that must be complied with for the attainment of a status, the perfection of a right, etc., or for admission to an office, employment, dignity, etc.,; as, the

On its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun.[3]

*Heller* also suggested that presumptively lawful regulations should be longstanding. Here, waiting periods— which first appeared on the books in California in 1923—constitute a sufficiently longstanding condition or qualification on the commercial sale of arms to be considered presumptively lawful. *See* Law of June 13, 1923, ch. 339, §§ 2, 10, 1923 Cal. Laws 695, 696.

---

*qualification* of citizenship." Webster's Second New International Dictionary, 2031 (1959).

[3] Although the constitutionality of waiting periods is an issue of first impression, in the aftermath of *Heller*, both our Circuit and our sister Circuits have concluded that regulatory measures need not be expressly named in *Heller* to be considered presumptively lawful. *See, e.g.*, *Peruta v. County of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016) (en banc) (holding that there was no Second Amendment right to carry concealed weapons in public); *Drake v. Filko*, 724 F.3d 426, 429 (3d Cir. 2013) (holding "the requirement that applicants demonstrate a 'justifiable need' to publicly carry a handgun for self-defense qualifies as a 'presumptively lawful,' 'longstanding' regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee"); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012) (holding that burdening "the ability of 18-to-20-year-olds to purchase handguns . . . is consistent with a longstanding, historical tradition"); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (holding that "the existence of a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns" places the law at issue in the presumptively lawful category).

Prohibitions on felon firearm possession illustrate this point.  Circuits that have considered the question agree "that longstanding prohibitions on the possession of firearms by felons are presumptively lawful."  *Binderup v. Att'y Gen.*, 836 F.3d 336, 347 (3d Cir. 2016); *see also United States v. Bena*, 664 F.3d 1180, 1182–84 (8th Cir. 2011).  The term "longstanding" is not restricted to the time of the founding of the Republic.  For example, the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938."  *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (citing Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250, 1251); *see also United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, J., concurring) (noting that "the weight of historical evidence suggests felon dispossession laws are creatures of the twentieth—rather than the eighteenth—century") (citation omitted).  Legal limits on firearm ownership by the mentally ill are also "of 20th Century vintage."  *Skoien*, 614 F.3d at 641 (citing Gun Control Act of 1968, Pub.L. 90–618, § 102, 82 Stat. 1213, 1220).  Extending even further into *Heller*'s list of examples, other authorities suggest that during the founding era, there were "no restrictions on the commercial sales of firearms as such," nor were there "bans on guns in schools [or] government buildings."  Adam Winkler, *Heller's Catch–22*, 56 UCLA L. Rev. 1551, 1563 (2009).

Thus, "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."  *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196; *see also Skoien*, 614 F.3d at 641 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791.").  We have agreed, noting that "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their

historical prevalence and significance is properly developed in the record." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).

Indeed, waiting-period statutes have existed in several states since the 1920s. *See, e.g.*, Law of June 13, 1923, ch. 339, §§ 2, 10, 1923 Cal. Laws 695, 696; Law of June 2, 1923, ch. 252, § 7, 1923 Conn. Laws 3707; Law of Mar. 7, 1923, ch. 266 § 10, 1923 N.D. Laws 379. And as the majority aptly points out, there is nothing new in having to wait to procure a firearm. Though delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history. Majority Op. at 23. To find otherwise is to focus too narrowly on the precise conduct that laws of the founding era regulated and to oversimplify the founders' views and the Court's views as expressed in *Heller*. Although the notion of a computerized background check would have been foreign to our founding ancestors, we do have clues about what was considered reasonable at that time. *See, e.g.*, *Bena*, 664 F.3d at 1183 ("In the 1760s, Blackstone explained that English subjects enjoyed a right to have arms for their defense, 'suitable to their conditions and degree' and 'under due restrictions.' This right and others, he recounted, were subject to 'necessary restraints,' viewed as 'gentle and moderate,' . . . . Proposals from the Founding period reflect a similar understanding of the pre-existing right to bear arms.") (citing 1 William Blackstone, *Commentaries* *139, 140).

Unlike the complete ban on handguns at issue in *Heller*, a ten-day waiting period only delays—for a brief, predictable term—the full exercise of the Second Amendment right to keep and bear arms. Such minor temporal regulation is not

without precedent. *See, e.g.*, *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012) ("By 1785, New York had enacted laws regulating when and where firearms could be used, as well as restricting the storage of gun powder.") (citing Act of Apr. 22, 1785, ch. 81, 1785 Laws of N.Y. 152; Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627). Moreover, as it applies to the appellees in this case, the delay does not even necessarily prevent them from exercising their right to keep and bear arms because they challenge the law on the basis that they already own firearms and should therefore be considered pre-cleared for acquiring more.

In addition, the imposition of a reasonable waiting period before the exercise of a constitutional right is not anomalous. *Cf. Skoien*, 614 F.3d at 641. The Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1538–42 (2009).

Of course, what is reasonable in one context may not be reasonable in another. For example, unpredictable political events may create a need for a permit to gather in a public space because "timing is of the essence in politics[:] It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring). In contrast, a known ten-day delay in procuring a firearm is relatively minor. No similar external time line exists in the gun ownership context, and certainly not for

those who already own firearms and are thus already exercising their Second Amendment rights.

Thus, just as it was in *Peruta*, the question here is whether the regulation in question is outside the scope of the Second Amendment and thus presumptively lawful. *See Peruta v. Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016). The answer to that question is yes. In full, California's reasonable waiting period is presumptively lawful as a condition or qualification on the commercial sale of arms, which the record demonstrates is also a longstanding regulatory measure. Therefore, I would resolve the inquiry at the first stage of analysis. If, however, the inquiry proceeded to the second stage, I agree completely with the majority's analysis.